No. 56,154

STATE OF KANSAS, *Appellee,* v. DANIEL ALLEN WOOD, *Appellant.*

(686 P.2d 128)

Opinion filed July 13, 1984.

*Robert L. Morse,* of Mission, argued the cause and was on the brief for appellant.

*Joseph E. Cosgrove, Jr.,* assistant district attorney, argued the cause, and *Dennis W. Moore,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Daniel Allen Wood appeals his jury trial convictions for aggravated sodomy (K.S.A. 21-3506); aggravated battery of a law enforcement officer (K.S.A. 21-3415); aggravated kidnapping (K.S.A. 21-3421); aggravated burglary (K.S.A. 21-3716); aggravated assault (K.S.A. 21-3410); three counts of aggravated assault of a law enforcement officer (K.S.A. 21-3411); two counts of rape (K.S.A. 21-3502); and two counts of felony theft (K.S.A. 21-3701).

Highly summarized, the events from which the twelve felony convictions arose commenced on the morning of December 9, 1982, when two Kansas City, Missouri, police officers noticed a suspicious vehicle in their city. The officers activated their emergency equipment and the suspect vehicle sped away. A high-speed chase ensued which ended in Johnson County, Kansas, where the defendant (driver of the fleeing vehicle) forced his way into an apartment, taking the female occupant thereof as hostage. All of the crimes against persons occurred in or near the apartment building. The hostage escaped after several hours of confinement and defendant was then arrested. Additional facts will be stated in the discussion of particular issues as necessary.

The first issue is alleged error in the trial court's refusal to

change venue. During the hours the hostage was being held prisoner, there was extensive media coverage devoted to the incident. Public interest in the case remained rather high through the trial.

In *State v. Miesbauer*, 232 Kan. 291, 654 P.2d 934 (1982), the law relative to trial venue was summarized as follows:

"The law favors a trial, criminal or civil, taking place in the locality from which the litigation arises. This view is by no means new and dates well back into Anglo-Saxon common law. In *Crocker v. Justices of the Superior Court*, 208 Mass. 162, 94 N.E. 369 (1911), the Massachusetts Supreme Judicial Court observed:

" 'It was the common law that the indictment for a crime must be found and tried in the county where it occurred, and ordinarily this principle was applied with great strictness.' 208 Mass. at 167.

The federal and Kansas constitutions, Kansas statutes, and Kansas judicial pronouncements reflect the common law on venue.

"Amendment Six of the United States Constitution reads:

" 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the *State and district wherein the crime shall have been committed* . . . .' (Emphasis supplied.)

Section Ten of the Kansas Bill of Rights provides:

" 'In all prosecutions, the accused shall be allowed . . . a speedy public trial by an impartial jury of the *county or district in which the offense is alleged to have been committed.'* (Emphasis supplied.)

"Consistent with the federal and state constitutions and the common law policy of a trial taking place in the locality, K.S.A. 22-2616(1) declares:

" 'In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county.'

The Kansas statute reflects a balancing of the constitutional right to a fair and impartial trial and the constitutional declaration and common law belief that a trial occur in the county wherein the crime shall have been committed.

"Recently the court in *State v. Shaffer*, 229 Kan. 310, 624 P.2d 440 (1981), discussed the matter of change of venue as follows:

" 'A change of venue will be granted a defendant when he or she can show prejudice has reached the community to the degree that it is impossible to get an impartial jury. Such prejudice may not be established by speculation but must be shown by specific facts or circumstances. *State v. Myrick & Nelms*, 228 Kan. 406, 616 P.2d 1066 (1980). Media publicity has never established prejudice per se. *State v. May*, 227 Kan. 393, 395, 607 P.2d 72 (1980). The granting of a change of venue lies within the sound discretion of the trial court. The burden is on the movant to show prejudice in the community, not as a matter of speculation but as a demonstrable reality.' 229 Kan. at 320.

In *State v. Sanders*, 223 Kan. 273, 574 P.2d 559 (1977), we concluded:

" 'Thus, it has been held (1) the burden of proof is on defendant, (2) not only

prejudice must be shown but it must be such prejudice as to make it reasonably certain the defendant cannot obtain a fair trial, (3) there must be more than speculation, (4) the state is not required to produce evidence refuting that of the defendant, and (5) granting a change of venue lies within the sound discretion of the trial court and its ruling will not be disturbed if supported by competent evidence and if there is no showing of prejudice to the substantial rights of the defendant.' 223 Kan. at 280." 232 Kan. at 295-96.

The record reflects there was no particular difficulty encountered in selecting the jury, the process taking less than a day. Defendant relies only upon media publicity in support of his claim of prejudice herein. As we recently iterated in *State v. Richard,* 235 Kan. 355, 681 P.2d 612 (1984):

"A change of venue in a criminal case lies within the sound discretion of the trial court. The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. Media publicity alone has never established prejudice per se. The defendant must show prejudice has reached the community to the degree it is impossible to get an impartial trial." Syl. ¶ 5.

We conclude no abuse of discretion has been shown in the trial court's refusal to change the venue of the trial herein.

For his second issue defendant contends the trial court erred in refusing to strike the entire jury panel for cause after a prospective juror indicated she believed the defendant was guilty.

During voir dire examination the State was asking questions about whether any of the pretrial publicity had affected potential jurors. One of the potential jurors was a Ms. Rita Summers who on the day of the incident had been listening to police radio communication on her police radio scanner. The following exchange occurred between Mr. Dennis Moore, prosecuting attorney, Ms. Summers and the court.

"MR. MOORE: Thank you. Very good.
"The third row. How many people there? Rita Summers, is that correct?
"VENIREWOMAN SUMMERS: Yes, radio, television, and *I have a scanner in my home and I would definitely be prejudiced he was guilty.*
"MR. MOORE: You heard something—
"THE COURT: Excuse me. Mr. Moore has stated in asking these questions, he is not asking what your opinion is. I would instruct the jurors whether you have an opinion about guilty or not being guilty, innocent, he is not asking that you state what your opinion is. I am instructing the jury to not state what your opinion is. He is simply asking if you have an opinion, if that is such that it would affect your service as a juror. Obviously we don't want any member of this jury panel to taint the rest of the jury. You may have an opinion one way or the other, but we

are not asking that you express that opinion so that the other jurors will have the benefit of your prejudice one way or the other. And I hope that you all understand that. Mr. Moore made that clear. Please do not express your opinion.

"MR. MOORE: Mrs. Summers, do you believe that based on what you saw and heard you could not be a fair and impartial juror; is that correct?

"VENIREWOMAN SUMMERS: Yes.

"MR. MOORE: You would ask that the Court excuse you on that basis?

"VENIREWOMAN SUMMERS: Yes.

"MR. MOORE: I ask that she be excused.

"THE COURT: Mrs. Summers may be excused for cause.

"(Whereupon at this time, Linda D. Gary was called to replace Rita M. Summers.)" (Emphasis supplied.)

No contemporaneous request to strike the jury panel for taint was made by defense counsel. Ultimately, defense counsel passed the panel for cause.

After the jury had been selected (but not sworn) the jury members and alternates were dismissed until the following morning. Subsequent thereto, but before the jury was sworn the following day, defense counsel moved to dismiss the selected jury for alleged taint from the Summers remark.

We conclude defendant's failure to object contemporaneously, coupled with his affirmative act of passing the jury for cause, waived any complaint defendant may have had relative to the Summers statement. It should also be noted there was never an issue in the trial relative to the identity of the perpetrator of the crimes. The defense centered around the mental capacity of the defendant and whether his acts constituted the crimes charged.

For his third issue defendant contends the rape statute then in effect (K.S.A. 21-3502) unconstitutionally discriminates against men.

At the time of the incidents herein, the operative Kansas rape law was found at K.S.A. 21-3502 which defined rape as being a sexual act committed by a *man* against a woman not his wife. This same challenge was raised and rejected by this court in *State v. Price,* 215 Kan. 718, 529 P.2d 85 (1974), wherein we said:

"A classification based upon sex can properly be made if it meets certain standards. (*Wark v. State* [Me. 1970], 266 A.2d 62.) We believe the sexual classification appearing in K.S.A. 1973 Supp. 21-3502 is not arbitrary, but reflects a rational and justifiable distinction. It is unnecessary to engage in an extended dissertation on the physiological differences between sexes, suffice it to say they exist. One of the more obvious reasons for the existence of our statute is to protect women against sexual attack and forced pregnancy. In view of the fact that only

members of the female sex are susceptible to pregnancy as a result of the conduct proscribed by this statute, the reasonableness of the classification is apparent. (*Green v. State* [Miss. 1972], 270 So.2d 695; *In re W.E.P.* [D.A. App. 1974], 318 A.2d 286; and *State v. Ewald,* 63 Wis. 2d 165, 216 N.W.2d 213.)" 215 Kan. at 723.

See Annot., Constitutionality of Rape Laws Limited to Protection of Females Only, 99 A.L.R.3d 129.

Defendant's position on this issue has fared no better before the United States Supreme Court. *E.g., Michael M. v. Sonoma County Superior Court,* 450 U.S. 464, 67 L.Ed.2d 437, 101 S.Ct. 1200 (1981). We conclude this issue is without merit.

The fourth issue is whether the trial court erred in refusing to merge the two rape counts into one count of rape. The facts surrounding the two rape counts must be examined carefully. At about 12:15 p.m. defendant forced his way into the victim's apartment. At about 1:00 p.m. defendant forced the victim to disrobe, whereupon he dragged her into the bedroom and raped her. Immediately thereafter defendant ordered the victim to get dressed and they returned to the living room. Between 3:30 and 4:00 p.m. defendant again ordered the victim to disrobe, raped her in the living room and ordered her to get dressed. The two rapes herein were clearly separate incidents and are readily distinguishable from the facts of the three attempted rape convictions discussed in *State v. Dorsey,* 224 Kan. 152, 578 P.2d 261 (1978), which the majority of this court held were merged into one attempted rape. We conclude the trial court did not err in refusing to merge the two rape charges into one.

For his fifth issue defendant contends the trial court erred in refusing to give defendant's requested instruction on diminished capacity. In his brief defendant concedes:

"There is clearly no case authority in this jurisdiction to support Appellant's contention. In fact the most recent case on this point, *State vs. Grauerholz,* 232 Kan. 221, [654 P.2d 395] (1982), openly rejects Appellant's contention.

" 'This court has consistently refused to adopt any test other than the M'Naghten test for insanity, and we steadfastly adhere to our prior opinions on the subject.' "

The court's rationale for rejecting the diminished capacity doctrine was discussed in *State v. Dargatz,* 228 Kan. 322, 614 P.2d 430 (1980), as follows:

"The doctrine of diminished or reduced mental capacity has been rejected by most jurisdictions on the rationale that insanity is an 'all or nothing' proposition.

Other states, although rejecting the doctrine, allow introduction of evidence of a defendant's abnormal mental condition for the purpose of rebutting the specific intent element of the crime. An excellent discussion of the issue can be found at 22 A.L.R.3d 1228, Mental and Emotional Condition as Diminishing Responsibility for Crime. The doctrine of diminished mental capacity, while never specifically rejected by this court, is inconsistent with the law of this state and we decline to adopt it. In *People v. Goedecke*, 65 Cal. 2d 850, 56 Cal. Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213 (1967), it was acknowledged that the defense of diminished mental capacity 'ameliorates' the *M'Naghten* test for insanity. This court has steadfastly adhered to the *M'Naghten* test for insanity. *State v. Levier,* 226 Kan. 461, 465, 601 P.2d 1116 (1979); *State v. Sandstrom,* 225 Kan. 717, 731, 595 P.2d 324 (1979); *State v. Sanders,* 225 Kan. 147, 155, 587 P.2d 893 (1978); *State v. Smith,* 223 Kan. 203, 574 P.2d 548 (1977)." 228 Kan. at 332.

We continue to steadfastly adhere to the *M'Naghten* test for insanity and to reject the doctrine of diminished or reduced mental capacity as a substitute therefor. Accordingly, the trial court did not err in refusing to instruct the jury on the doctrine of diminished capacity as requested by the defendant.

The sixth issue is whether the trial court erred in not merging two of the aggravated assault on a law enforcement officer counts into the aggravated assault charge.

After the defendant had holed up in the apartment and taken the occupant thereof hostage, law enforcement officers converged on the area. One of the officers in immediate pursuit had been shot in the hand by the defendant just prior to defendant entering the apartment complex. (The facts relative to this incident will be discussed in greater detail in another issue.) Police officers knew defendant was in an apartment but due to poor acoustics could not ascertain in which of two apartments defendant was located. Detective Kramer and Officer McBride (both Missouri police officers) were in the stairwell talking to defendant trying to get him to surrender. Another officer was also present. Defendant fired a number of shots through the apartment door. Another shot was fired over the head of the hostage who was sitting in a chair which backed up to the apartment wall adjacent to the stairwell. This latter shot carried through the wall and possibly was the one that narrowly missed Detective Kramer. Two of the three aggravated assault charges against a law enforcement officer were predicated upon the shooting into the stairwell incident (door and wall shots). Defendant contends the shot over the hostage's head was an assault on her alone and the fact the bullet narrowly missed an officer on the other side of

the wall does not form the basis of an assault charge on the officer.

The question of whether a single act affecting multiple victims constitutes a single or multiple offense has been a matter of considerable debate by courts in this country. See Annot., Single Act Affecting Multiple Victims as Constituting Multiple Assaults or Homicides, 8 A.L.R.4th 960.

In this issue defendant appears to take the position that the shot aimed at the hostage is the only shot involved. The evidence is undisputed numerous shots were fired through the door. This is not a single shot giving rise to multiple victims situation.

The facts herein are distinguishable from those in *State v. Duncan,* 3 Kan. App. 2d 271, 593 P.2d 427 (1979). In *Duncan,* defendant fired one shot at an officer and two more at the hasp and padlock on a locked door. The defendant was trying to open the door so he could escape when he fired the door shots. He had no reason to suspect there was another officer on the other side of the door. Defendant was convicted of three counts of aggravated assault on a law enforcement officer. The Court of Appeals held the only assault was of the officer at whom defendant had fired directly. The *Duncan* opinion held *inter alia:*

"Assaults with a firearm upon each of several law enforcement officers occurring during one episode, but at different times, constitute separate offenses of aggravated assault upon each of the law enforcement officers." Syl. ¶ 1.

We conclude the trial court did not err in refusing to merge two of the aggravated assault against a law enforcement officer counts into the aggravated assault charge.

The seventh issue is related to the sixth issue. In this issue defendant contends the two aggravated assault against a law enforcement officer convictions arising from the stairwell incident are improper because defendant did not know precisely where the officers were located when he fired the shots. In his brief defendant states:

"In every pertinent case that appellant found concerning assault generally there was some apparent direct contact where the accused and his victim could see one another. This is not meant to say that there could not be a situation where an assault could occur without direct confrontation. This though is not the case."

No "pertinent case" is cited. Indeed no authority of any specie in support of defendant's position is stated.

Defendant knew there were police officers in the stairway barring his escape. He fired the shots to injure or frighten them. The fact he did not know precisely where the officers were located is of no consequence. We conclude this issue is without merit.

For his eighth issue defendant contends his convictions. for aggravated battery against a law enforcement officer and for the aggravated assaults against law enforcement officers are invalid on the basis the victims were Missouri officers. K.S.A. 22-2404, Kansas' version of the Uniform Fresh Pursuit Law, provides:

"(2) Any law enforcement officer of another state who enters this state in fresh pursuit and continues within this state in fresh pursuit of a person in order to arrest him on the ground that he has committed a crime in the other state has the same authority to arrest and hold such person in custody as law enforcement officers of this state have to arrest and hold a person in custody."

Detective Wharton, a Kansas City, Missouri, officer, was in the original pursuing police car which chased defendant from Missouri to Kansas. After defendant's vehicle collided with another automobile, defendant took off running with Detective Wharton in pursuit. Just outside the apartment building defendant turned and shot the officer in the hand.

Defendant concedes Detective Wharton was in "hot pursuit" when he was shot. Defendant contends, however, the officer did not reasonably suspect defendant had committed a crime in Missouri. The record reflects the officer's attention was first directed to defendant by virtue of his vehicle being an expensive late-model Mercedes-Benz convertible located in a low-income area of the city. Additionally the vehicle had only one license plate and Missouri law requires two. When the officers activated their emergency equipment to stop the vehicle, it sped away. During the ensuing high-speed chase the officers learned from a radio dispatcher the vehicle matched the description of a vehicle recently stolen. It is unclear whether the radio dispatch was received while the chase was in Missouri or Kansas. To state the facts is to answer the question raised by this point. Clearly the officers had reason to believe a crime had been committed in their state. The vehicle was in violation of the law by being operated with only one license plate (adequate cause for stopping the vehicle). In addition there were traffic violations occurring during the chase. The added element of the vehicle

having been suspected of being stolen is unnecessary to the issue raised.

Offhandedly defendant questions the law enforcement officer status of McBride and Kramer (the officers in the stairwell shooting incident). The pursuit of defendant did not end when he took the hostage and holed up in the apartment—it ended when the defendant was arrested. These officers were a part of the continuing pursuit. We conclude this issue, in its entirety, is without merit.

For his ninth issue defendant contends the officer victims herein had not previously properly identified themselves as law enforcement officers and hence the various convictions for offenses against law enforcement officers were improper. In *State v. Bradley,* 215 Kan. 642, 527 P.2d 988 (1974), this court held:

"Under K.S.A. 1973 Supp. 21-3411 an aggravated assault of a law enforcement officer is an aggravated assault, as defined in section 21-3410, committed against a uniformed or properly identified law enforcement officer while such officer is engaged in the performance of his duty." Syl. ¶ 1.

"A 'properly identified' law enforcement officer under K.S.A. 1973 Supp. 21-3411 is one who has been identified in such a manner to the defendant that he reasonably should know him to be a law enforcement officer." Syl. ¶ 2.

"To sustain a conviction under K.S.A. 1973 Supp. 21-3411, proscribing an aggravated assault upon a law enforcement officer in the performance of his duty, it is not necessary that the state prove the defendant had actual knowledge that the person assaulted was a law enforcement officer." Syl. ¶ 3.

"An officer-victim under K.S.A. 1973 Supp. 21-3411, proscribing an aggravated assault upon a law enforcement officer engaged in the performance of his duty, need not personally identify himself as a law enforcement officer to the defendant. The statute merely requires that the officer-victim be properly identified without designating the method." Syl. ¶ 4.

With this in mind, we shall look at the facts relative to each officer-victim. Detective Wharton was in plain clothes in an unmarked vehicle. Upon observing defendant's vehicle was only displaying one license plate, emergency equipment (light and siren) was activated. Defendant declined to stop and sped from the scene. A chase ensued at speeds exceeding 100 m.p.h. After defendant's vehicle collided with another automobile, defendant fled the scene on foot with Detective Wharton in pursuit. No conversation occurred between the two. Defendant shot the detective in the hand and ran into a nearby apartment complex. He then forced his way into an apartment, stating he had just shot a cop in the hand. Obviously, there was sufficient evidence from

which the jury could have concluded defendant reasonably should have known Detective Wharton was a police officer at the time he fired upon him.

Next we will consider the facts relative to the two stairwell assaults (Detective Kramer and Officer McBride). The detective was in plain clothes; the officer was in uniform. Defendant could not see either officer so their attire is irrelevant. Approximately two hours elapsed between defendant entering the apartment and the shots being fired. During this time these officers and others were trying to talk defendant into surrendering without harming the hostage. It is clear there was abundant evidence from the totality of the circumstances from which the jury could have concluded the defendant reasonably should have known the men in the stairwell were law enforcement officers.

Next we will consider the facts relative to the assault on Officer Baldwin. This officer was a member of the Overland Park Response Team which is a special police group of the genre commonly referred to as a SWAT unit. The officer was clothed in a dark jumpsuit with a dark baseball cap. He was stationed below an evergreen which gave him a view of the window of the apartment involved in the seige. He was armed with a rifle carrying a telescopic sight. At about 4:07 p.m., with some thirty law enforcement officers on the scene, defendant fired shots in the vicinity of the evergreen. At the same time defendant stated he was "going to kill the guy in the bushes." Defendant had been under police seige several hours at the time. We conclude there was ample evidence from which the jury could conclude defendant reasonably should have known Officer Baldwin was a law enforcement officer at the time he fired upon him. We find this issue, in its totality, wholly without merit.

For his tenth issue defendant contends the sentences imposed were excessive. All sentences were within the statutory limits. The sentences imposed were as follows: felony theft (the automobile)—3 to 5 years; aggravated battery on a law enforcement officer—5 to 20 years; aggravated kidnapping—life; aggravated burglary—3 to 10 years; aggravated assault (hostage)— 3 to 5 years; aggravated assaults of three law enforcement officers—5 to 10 years on each; rape—15 years to life on each of the two counts; felony theft (the gun)—2 to 5 years; and aggravated sodomy—15 years to life. The sentences imposed for aggravated kidnapping,

the two rapes, and the aggravated sodomy were ordered to run consecutively.

All sentences are within the statutory limits therefor. There is no contention the trial court did not consider the sentencing criteria set forth in K.S.A. 21-4606. Defendant intentionally endangered the lives of many persons during his crime spree. He terrorized, degraded, and brutally attacked his hostage sexually. The victim finally escaped the nightmare situation by jumping from her upper-floor apartment whereby she was seriously injured. Defendant then aimed his gun at the woman as she tried to crawl away, but retreated when he was fired upon by the police. This scenario was repeated once more before the hostage could crawl to safety. We do not find any error or abuse of discretion in the sentences imposed herein.

All other issues raised by defendant have been considered and are held to be without merit.

The judgment is affirmed.

HOLMES, J., not participating.