(993 P.2d 1237)
No. 81,116

STATE OF KANSAS, *Appellee*, v. MARLIN D. LONG, *Appellant*.

Opinion filed December 10, 1999.

*Richard Ney*, of Law Offices of Richard Ney, of Wichita, for appellant.

*David Lowden*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before CHIEF JUSTICE McFARLAND, presiding, WAHL, S.J., and MARLA J. LUCKERT, District Judge, assigned.

McFARLAND, C.J.: Marlin D. Long appeals his jury trial convictions of five counts of rape (K.S.A. 1998 Supp. 21-3502[1][a]), level 1 person felonies, two counts of aggravated criminal sodomy (K.S.A. 21-3506[a][3][A]), level 2 person felonies, and one count of aggravated burglary (K.S.A. 21-3716), a level 5 person felony. Defendant was sentenced to a controlling term of 1,487 months' imprisonment.

By virtue of the particular issues raised, the facts will be set forth in the discussion of the issues.

## MULTIPLICITY

For his first issue, defendant contends four of the five rape counts are multiplicitous as they were part of one continuous event. In support thereof he relies on *State v. Dorsey*, 224 Kan. 152, 578 P.2d 261 (1978).

Multiplicity exists when the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous when the offenses occur at different times and in different places. A test for determining whether a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not necessarily result in a single crime. *State v. Harkness*, 252 Kan. 510, 531, 847 P.2d 1191 (1993); *State v. Woods*, 250 Kan. 109, Syl. ¶ 7, 825 P.2d 514, *cert. denied* 506 U.S. 850 (1992).

All of the crimes occurred in a 1- to 2-hour period in an apartment in Wichita. S.R.G. was the victim of each offense. There is no question of identity. Defendant testified the sexual acts were consensual.

Unfortunately, the facts must be set forth in considerable detail for proper analysis of this issue. S.R.G. testified she was asleep on her bed in her apartment when she was awakened to find an unknown masked man on top of her. She testified the following then occurred: Defendant put his hands on her neck and mouth when she started to scream, and he threatened to kill her. She was repeatedly threatened during her ordeal. She did not consent to any of the acts.

Aggravated Criminal Sodomy #1: On the Bed in the Bedroom

Defendant performed an act of oral sodomy on S.R.G.

Rape #1: On the Bed in the Bedroom

Defendant then had intercourse with S.R.G. and made her move into different positions on the bed.

### Rape #2: On the Floor in the Bedroom

S.R.G. testified that after defendant raped her on the bed, he took her to the floor of the bedroom. He again forced her to have intercourse, making her get into different positions. He made her get on top. He made her get on her knees while he had intercourse from behind. Defendant had not yet ejaculated and told S.R.G. he could go all night. He would occasionally stop, and S.R.G. believed he was trying to avoid ejaculating.

### Uncharged: Leaning over the Bed in the Bedroom

Defendant forced S.R.G. to rise from the floor and lean over the bed in the bedroom. He had intercourse with her from behind. He was very rough.

### Aggravated Criminal Sodomy #2: Anal Penetration

While defendant was having "rough" intercourse with S.R.G. over the bed, he suddenly entered her anally with his penis. S.R.G. said it hurt badly, shot pain through her whole body, and she screamed. Defendant threw her on the bed, started choking her again, and threatened to kill her.

### Uncharged: On the Bed & Floor in the Bedroom

Defendant started to have intercourse with her again on the bed but the bed was making noise. Defendant then took her to the floor of the bedroom. He began to have sexual intercourse with her again on the floor but "that didn't last very long."

### Rape #3: In the Bathroom

S.R.G. thought she was going to vomit and told defendant she was going to be sick. Defendant took her to the bathroom where he leaned her over the toilet and had intercourse with her there while she begged him to stop because she was going to throw up. Defendant had intercourse with her from behind.

### Rape #4: In the Living Room Leaning over the Couch

Defendant led S.R.G. to the living room. He forced her to lean over the couch and had intercourse with her from behind.

## Rape #5: In the Living Room on the Couch

Defendant then sat on the couch, pulled her on top of him, and had intercourse with her again. S.R.G. knew at this point if defendant ejaculated, she might be able to get away. S.R.G. said when she was on top of him on the couch she did not want to stop the intercourse because she wanted him to ejaculate and he did. Defendant swore at her and pushed her away from him.

It was at this point that S.R.G. was able to break away from her captor, running naked from the apartment.

Defendant contends all the rapes subsequent to the first one were parts of one continuous event and therefore merged into the first rape under authority of *State v. Dorsey*, 224 Kan. 152.

The State argues defendant moved S.R.G. to multiple locations throughout the house to perform the rapes: on the bed, on the floor, in the bathroom, over the couch, and on the couch. These were separate events. Further, the facts in *State v. Howard*, 243 Kan. 699, 763 P.2d 607 (1988), are analogous, and a similar multiplicity challenge was rejected in that appeal.

In *Dorsey*, 224 Kan. 152, the defendant was convicted of kidnapping (one count), attempted rape (three counts), and aggravated oral sodomy (two counts). On appeal, defendant raised two issues: prosecutorial misconduct and sufficiency of the evidence. Neither issue had merit in the court's eyes. However, the court considered, *sua sponte*, whether the attempted rape and sodomy convictions were multiplicitous. The crimes had occurred in the following sequence: Kidnapping 12:30 a.m., attempted rape 12:35 a.m., attempted rape 12:45 a.m., aggravated oral sodomy 12:50 a.m., attempted rape 1:20 a.m., and aggravated oral sodomy 1:35 a.m. The facts supporting the convictions were not otherwise included in the *Dorsey* opinion. The court dismissed three of the convictions as multiplicitous. In doing so, the court stated:

"The only difference in the three allegations of [attempted] rape and the facts necessary to prove the acts, was a lapse of a few minutes between each alleged offense. Under the circumstances, we fail to find where there has been more than one act of attempted rape. The same is true of the allegations of oral sodomy. On the other hand, the proof necessary to convict the defendant of kidnapping, rape or attempted rape and sodomy requires different facts and therefore the convic-

tion as to one count of each of these three different crimes would not be multiplicitous." 224 Kan. at 156.

The dissent in *Dorsey*, joined by two other justices, concluded that the majority had confused repetition of the same crime with multiplicity, noting the result reached by the majority would mean that no matter how many times a victim is raped by the same person it would be but one offense as long as the time frame is contiguous.

In 1988, in *Howard*, 243 Kan. 699, the question of multiplicity and sex crimes was considered again. Detailed facts were included in the opinion. The victim had gone to Howard's apartment to get some furniture. Howard hit her over the head, beat her, bit her and demanded she undress. Howard then forced intercourse. Howard then anally sodomized her and forced her to perform oral sex on him. He repeatedly threatened to kill her, broke a glass and shoved her head toward the broken pieces. When the victim tried to escape by saying she needed to go to the bathroom, Howard grabbed her arm, accompanied her to the bathroom and again forced oral sodomy. He then leaned her over the bathtub and again anally sodomized her. He then shoved the victim down the hallway and against the bedroom door, when Howard again anally sodomized her. She attempted to flee, was apprehended, and forced into the bedroom where another act of oral sodomy occurred. The victim managed to escape and ran naked and screaming out of the apartment, knocking on a neighbor's door for refuge. At the trial, Howard testified the sex was consensual. Howard was convicted of aggravated kidnapping, rape (two counts), and aggravated criminal sodomy (six counts).

On appeal, Howard argued the multiple rape and sodomy convictions were multiplicitous. The appellate court framed the issue as "how widely separated in time and place separate actions must be in order not to be considered part of a single wrongful act." 243 Kan. at 703. Distinguishing Dorsey, the court held that the acts in *Howard* took place over a time span of 1½ to 3 hours and were separate and distinct, occurring at different times in different locations in the house and separated from each other by other sexual

acts. The court concluded the acts were not multiplicitous as they were clearly separate. Justice Holmes dissented, arguing that *Dorsey* was controlling.

Specifically, the Supreme Court held:

"We distinguished *Dorsey* in *State v. Wood*, 235 Kan. 915, 920, 686 P.2d 128 (1984), holding the trial court did not err in refusing to merge two counts of rape. In *Wood*, the victim was disrobed and raped in her bedroom. Two or three hours later, the victim was again disrobed and raped, this time in the living room. We found the two incidents to be clearly separate.

"This case is analogous to *Wood* and distinguishable from *Dorsey*. The acts took place over a time span of one and a half to three hours and were separate and distinct, occurring at different times in different locations in the house and separated from each other by other sexual acts. We find the acts committed by Howard clearly separate and thus not multiplicitous." 243 Kan. at 703.

In 1992, multiplicity and sexual assault were revisited in *State v. Richmond*, 250 Kan. 375, 827 P.2d 743 (1992). Again, the facts were given in detail. The victim returned to her residence and interrupted a burglary. Richmond hit her as she walked into the house, forced her into her bedroom, threw her on the bed, and raped her. Richmond walked her into the bathroom, returned to the bedroom, and tied her to the bed. Richmond left the room for what seemed to the victim like a long time. When he returned, he untied her, raped her again, and retied her. Richmond threatened her with a knife, stole the necklace she was wearing and left her tied to the bed, threatening to kill her if she reported the crime. The incident lasted approximately one hour.

On appeal, Richmond argued that the rape convictions occurred so closely in time and circumstance that only one offense was committed, citing *Dorsey*. The majority opinion pointed out that *Dorsey* had been a four to three decision, that the propriety of the result reached in *Dorsey* was questionable, and the facts in *Richmond* were distinguishable. Richmond had left the room to continue his search of the home. The length of his absence was unknown, although the victim said it seemed like 2 hours, which was an impossibility given the time frame. However, there was a clear and substantial break in the circumstances.

We conclude that under the facts herein the five rape convictions are not multiplicitous as they are sufficiently separated by time, location, and circumstance to constitute separate offenses rather than one continuous incident.

## MOTION TO SUPPRESS

For his second issue, defendant contends the district court erred in overruling his motion to suppress evidence found in the apartment where he was arrested. He contends the police entry therein was illegal.

We pick up the factual background where we left off in the preceding issue. When S.R.G. ran screaming from her apartment at approximately 2 a.m., she was heard and observed by a neighbor, Randy Sullard, who saw her in the parking lot. He heard her yell, "He's after me." Sullard saw a man come across the parking lot from the same direction the woman had come. The man was "skulking around hiding." Sullard watched the man squat down behind a car when another car came through the parking lot then run between two buildings, fall over a bush, get up, and eventually run to building 8, disappearing into an unlit area on the front and center of the building. Sullard waited and watched but the man did not reappear. Sullard told the police what he had seen, describing the man as a white male with light-colored curly hair wearing dark clothing.

Officer Dean and Officer Woodard responded to the rape call at Fox Run Apartments. Dean and Woodard went to investigate apartment 812 after hearing Sullard had seen a curly headed man run into that building. Dean knocked on the door, received no answer, and tried the door knob. As soon as he "touched the doorknob and applied some pressure to it, the door came open." The door was immediately pushed closed from inside by a white male with curly blond hair sitting on a chair beside the door. Dean said, at that point, "we pushed the door completely open." Dean observed some damage to the door. Still standing outside the open door, the officers announced themselves. With the door open, they could now see an individual sleeping in the bed. They kept announcing themselves, trying to get the man to respond. He even-

tually sat up in bed and gave verbal permission for officers to enter and search the apartment. Officers inquired several times as to whether there was anyone else in the apartment. He told them there was not. Officers found defendant in the bathroom.

On cross-examination, defense counsel inquired further as to how the door was opened. Dean said the first time he turned the knob, the door opened. He had not yet seen the damage to the door. Dean pushed on the door the second time because of the unusual response. He saw the damage to the door the second time the door was open. Dean said they did not enter into the apartment until the man in bed, Kary Lathrop, the apartment's tenant, gave them permission.

Officer Woodard was with Officer Dean and gave this version: Woodard said when they first approached the door, he could see the door was damaged. The paint was cracked on the doorjamb and it looked like someone had forced the door. Dean tried the door knob to see if the door was locked. The door "opened up" about 6 to 8 inches and was slammed shut. When the door was open, they identified themselves as police officers. Dean knocked again and, as he knocked, the door opened by itself. They could then see someone lying in the bed. With their flashlights on, officers again identified themselves. When the door was open the first time, Woodard could see that the doorjamb was splintered, and the face plate was gone. Woodard said they remained on the concrete porch area outside the door trying to rouse the man on the bed. Finally he awoke and gave them permission to enter. The officers came in and asked if anyone else was in the apartment. The man said no. They saw a closed door and asked him if anyone was in the room behind the door. He said not that he knew.

Defendant was found naked in the bathroom with his clothes in a bathtub full of water. Money and grass were also in the water.

Lathrop recognized defendant as the brother of a friend. Lathrop and defendant had earlier that evening been drinking in a local bar. Defendant mentioned he had no place to stay that night and Lathrop said he could stay with him. Lathrop was not feeling well, was coming down with a cold, and had been drinking beer. He went back to his apartment alone, took a cold pill, and went to

bed. He did not hear defendant break into the apartment and was unaware of defendant's presence until the officers found him in the bathroom. He testified he did not authorize defendant to break in the door to enter when he told him he could spend the night while they were in the bar. He gave the officers oral and written consents to search his apartment.

In his motion to suppress, defendant argues that the illegal entry was the opening of the door the first time, and that is his position before us. The question we must initially determine is whether defendant has standing to raise the issue. This turns on whether he had a reasonable expectation of privacy within the apartment.

The question of houseguests and the 4th Amendment to the United States Constitution was considered in *Minnesota v. Olson*, 495 U.S. 91, 109 L. Ed. 2d 85, 110 S. Ct. 1684 (1990). There, Olson was suspected of armed robbery and murder. Police had seized an abandoned car, finding the murder weapon, the money, and identifying information about Olson inside. Later, a tipster directed police to where Olson was staying. After surrounding the house, police placed a telephone call to the occupants, ordering Olson to come out. The detective placing the call heard a male voice in the background saying to tell the police he had left. This was relayed to the caller. The detective then ordered police to enter the house, which they did without permission and with weapons drawn. Police found Olson hiding in a closet. Shortly after his arrest, Olson made inculpatory statements.

Olson had been a guest at the house for several days. He had slept on the floor the night of the robbery, with the owner's permission. He had a change of clothing with him.

The trial court denied Olson's request to suppress his statement and Olson was convicted. The Minnesota Supreme Court reversed, ruling Olson had a sufficient interest in the home to challenge the legality of his warrantless arrest, his arrest was illegal because there were no exigent circumstances justifying the warrantless entry, and Olson's statement was tainted by that illegality and should have been suppressed. The United States Supreme Court affirmed.

The *Olson* Court first noted that the capacity to claim the protection of the Fourth Amendment depends upon whether the per-

son who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. Further, a subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. The Court opined:

"To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

"From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. . . .

"That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household." 495 U.S. at 98-100.

The houseguest doctrine recognized in *Olson* has been recognized in Kansas. *State v. Jones*, 24 Kan. App. 2d 405, 409, 947 P.2d 1030 (1997). In that case, both the trial court and the appellate court found that Jones was a houseguest and could therefore assert

his Fourth Amendment rights in that case. The issue was not litigated on appeal. There, Jones had known his host for about a year and had stayed overnight on many occasions. His host sometimes gave him the key so he could stay. Jones liked to stay at his host's apartment because it was peaceful. Jones kept clothes and a few personal possessions at this apartment.

In this case, Lathrop knew defendant through defendant's brother. Unlike the situations in *Jones* and *Olson*, defendant did not keep any clothing or personal items at Lathrop's apartment. He had no key and the offer to spend the night was just that. While defendant had earlier indicated he would be staying at Lathrop's apartment, he gave no such indication when he last spoke to Lathrop. A few hours later, defendant forcefully kicked or otherwise forced the door and then entered. When Lathrop was asked about giving defendant his permission to spend the night, Lathrop answered, "I told him he could stay there but he, you know, knock on the door, not knock it in, I mean." When the police arrived and awakened Lathrop, he said no one else was in the house and no one else should be in the house.

Did defendant have a reasonable expectation of privacy in Lathrop's apartment at the time in question under the circumstances herein? We believe not.

Defendant gained entry to the premises by forcing the door, doing considerable damage to the door and its lock in the process. He was not authorized by the tenant to enter by force. He had no personal effects in the apartment and had earlier in the evening been offered it as a place to stay for the night. Under the circumstances herein, defendant cannot be said to have a reasonable expectation of privacy in the apartment. It is rather ironic that the damage to the previously locked door by the defendant is presumably why the door opened so easily when the officers were present which afforded them the view of defendant.

We find no reversible error in this issue.

## SENTENCES

For his final issue, defendant contends the sentences imposed constitute cruel and unusual punishment in violation of the United States and Kansas Constitutions.

It was undisputed in the district court that defendant had a criminal history in category A. Defendant filed a motion for downward departure, which the district court denied. The sentences were imposed under the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*

The State did not argue for upward departure but requested that the court impose the longest term within the appropriate sentencing grid box for the primary crime, with the remaining sentences in the middle range. The State requested that the rapes occurring in different rooms run consecutively to each other, resulting in a controlling sentence of 1,528 months.

The court imposed the following sentence: Count 1, rape, the primary conviction, 816 months; Count 2, rape, 184 months; Count 3, rape, 184 months; Count 4, rape, 184 months; Count 5, rape, 184 months; Count 6, aggravated criminal sodomy, 136 months; Count 7, aggravated criminal sodomy, 136 months; Count 8, aggravated burglary, 31 months. The judge then said,

"I have given great consideration and thought as to the nature of my sentencing and how these—and whether or not to run any of these counts concurrent or consecutive. I do want to point out some of the things that I have considered in arriving at my decision.

"First and foremost, I do want to point out that these heinous rapes occurred within 24 hours of Mr. Long being released from prison on parole. His parole papers were barely dry before he broke into this woman's apartment, invaded the sanctity of her home, and raped her repeatedly and cruelly.

"I have listened very carefully to your argument, Mr. Ney [defense counsel], and I do want to say in regard to a couple of your comments, to say that to sentence this man to over 100 years would be cruel and unusual punishment and that it is a greater sentence than that imposed on some of the most heinous first-degree murders, I do want to point out that what occurred in this apartment to this woman was cruel at its basest degree. It was as cruel as you can be to another human. And while she lived through this experience, undoubtedly due to her own quick thinking, bravery, and fortitude, she will live for a long time suffering because of what you have done with her—to her. And I have considered those matters in arriving at my decision.

"Counts 1 and 2 will run consecutive to all the others. Count 3 is consecutive. Count 4 and 5 are consecutive. Count 6 is consecutive. Count 7 is consecutive, and Count 8 is consecutive."

Defendant was sentenced to a controlling term of 1,487 months.

We must first consider whether we have jurisdiction to determine this issue.

K.S.A. 21-4721(c)(1) provides that any sentence within the presumptive sentence for the crime is not reviewable by an appellate court. It is undisputed that each sentence herein is within the statutory presumptive sentence for a person having a category A criminal history. Hence, there is no statutory appeal from any individual sentence herein.

Defendant attacks only the running of some of the sentences consecutively. In *State v. Ware*, 262 Kan. 180, Syl. ¶ 4, 938 P.2d 197 (1997), the Kansas Supreme Court held:

"Where a defendant challenges his or her presumptive sentencing on the ground that the running of multiple sentences consecutively constitutes an abuse of judicial discretion, no ground for appeal authorized by the K.S.A. 21-4721 is asserted, and this court lacks jurisdiction to consider the issue."

K.S.A. 21-4721(e) provides:

"In any appeal, the appellate court may review a claim that:
(1) A sentence that departs from the presumptive sentence resulted from partiality, prejudice, oppression or corrupt motive;
(2) the sentencing court erred in either including or excluding recognition of a prior conviction or juvenile adjudication for criminal history scoring purposes; or
(3) the sentencing court erred in ranking the crime severity level of the current crime or in determining the appropriate classification of a prior conviction or juvenile adjudication for criminal history purposes."

Defendant's sentences herein were not departure sentences and there is no claim that they resulted from partiality, prejudice, oppression, or corrupt motive.

In *Ware*, 262 Kan. 180, Syl. ¶ 2, the Supreme Court also held:

"Where K.S.A. 21-4721 applies, an appellate court's jurisdiction to consider a challenge to a sentence is limited to those grounds authorized by the statute or a claim that the sentence is otherwise illegal."

The challenge to the sentences in *Ware* was based on alleged abuse of judicial discretion. Does just couching a challenge to running KSGA sentences in terms of being constitutionally impermissible on the ground the result is allegedly cruel and unusual pun-

ishment make the consecutiveness aspect of the sentences appealable? We believe not.

Even if we were to hold we had jurisdiction to determine this issue, defendant cannot prevail.

In *State v. McCloud*, 257 Kan. 1, Syl. ¶¶ 1-3, 891 P.2d 324, *cert. denied* 516 U.S. 837 (1995), the Kansas Supreme Court held:

"Section 9 of the Kansas Constitution Bill of Rights provides that no cruel or unusual punishment can be inflicted by the State. Although the constitutional prohibition against cruel or unusual punishment is directed primarily at the kind of punishment imposed rather than its duration, the length of a particular sentence may be so excessive as to constitute cruel and unusual punishment."

"In determining whether the length of a sentence offends the constitutional prohibition against cruel or unusual punishment, three factors should be considered: (1) the nature of the offense and the character of the offender, with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of the offender's culpability for any resulting injury, and the penological purposes of the prescribed punishment; (2) a comparison of the penalty with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect; and (3) a comparison of the penalty with punishments in other jurisdictions for the same offense."

"The fact that a minimum sentence imposed by a district judge exceeds the life expectancy of the defendant is not grounds, per se, for finding that the sentence is oppressive or constitutes an abuse of discretion."

Independent research has revealed no cases in which a KSGA sentence has been challenged as being cruel and unusual punishment.

We will briefly discuss the three factors set forth in *McCloud* in determining issues relative to claims of cruel and unusual punishment. As to factor (1), nature of offense and character of defendant, defendant's arguments are essentially the same as he raised in his motion for a downward departure. That is that although his criminal history was in category A, his past offenses were not as egregious as that category made it appear, as there was never any allegation of aggravated burglary, only simple burglary. Thus the prior crimes were person crimes in name only. The circumstances "overrepresent" defendant's criminal past. Also, he argues the nature of each offense was "far less aggravated than a normal sexual assault." He does not attempt to define a "normal sexual assault."

As for factor (2), defendant notes that his controlling sentence is greater than a murderer would ordinarily receive. A similar claim was made in *McCloud*, 257 Kan. 1, and rejected as a basis for claims of cruel and unusual punishment.

It should be noted as to these factors that the legislature, through the KSGA, took both the nature of the offense (crime severity level) and the character of the offender (criminal history) into consideration when it designed the sentencing grid. Provisions were made for departure when appropriate. As such, defendant's sentence is within the same range as that of any other person convicted of similar crimes. The sentencing court rejected defendant's arguments in support of a departure. Further, the sentencing court considered defendant's arguments raised on this point and rejected them, finding that the rapes were cruel at the basest level and that defendant had been released on parole less than 24 hours before he committed these crimes.

Defendant does not discuss or apply factor (3) comparison with penalties in other jurisdictions.

We conclude we lack jurisdiction to review the sentences imposed herein, and even if we were to determine the issue, it has no merit.

The judgment is affirmed.