No. 77,020

STATE OF KANSAS, *Appellee,* v. DANIEL M. DIAS, *Appellant.*
(949 P.2d 1093)

Opinion filed December 12, 1997.

*Rick Kittel,* assistant appellate defender, argued the case, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for the appellant.

*David Lowden,* assistant district attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SIX, J.: Defendant Daniel M. Dias appeals his conviction and sentence for first-degree premeditated murder of his wife, Deborah Dias. K.S.A. 21-3401(a). Dias received a hard 40 sentence. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The primary issues are whether the district court committed reversible error in: (1) failing to instruct the jury on voluntary manslaughter as a lesser included offense of first-degree murder; and (2) giving a non-PIK, *Allen*-type instruction over the objection of defense counsel. Secondary issues relate to whether the district court abused its discretion in: (1) allowing the victim's sister to testify about knives allegedly belonging to Dias; and (2) imposing the hard 40 sentence.

We find no reversible error and affirm.

## FACTS

Dias believed his 1993 marriage to Deborah was going well. Deborah kept telling him that something was wrong.

In November 1995, Deborah decided she wanted a divorce. She asked her sister, Karen Comeau, to help move Dias' personal items out of the house while he was at work. Deborah had the house locks changed to prevent Dias from entering after divorce papers were served.

During the next 2 months, Deborah continued to have contact with Dias. She made plans to see him over the holidays. A Dias co-worker thought Dias and Deborah were trying to patch up the marriage. Two co-workers heard Dias say that if he had a gun, he would shoot his wife and then kill himself. Neither co-worker took him seriously.

On New Year's Day, Deborah and Dias arranged to see each other. After giving her a bird as an anniversary present, Dias asked Deborah if she wanted to reconcile. Deborah said, "No." She further stated she had already filed the divorce papers and did not want to get back together. Dias urged her to reconsider. According to Dias, he "lost it." He grabbed a knife from a butcher block in the kitchen but decided the knife was too small. He pulled out a large carving fork. Dias said, "Well Deb, this is it. I'm ending this right now." He told her that he could not live without her. Dias stabbed Deborah in the abdomen and chest. She fell to the ground screaming, "Why are you doing this? I didn't think you would do this."

Dias then stabbed himself in the stomach with the fork as Deborah lay on the floor watching. He got up with the fork still in his stomach, picked up a large knife, and knelt down in a straddle position over Deborah. He pulled the fork out and plunged the knife into his stomach. Deborah was still watching him. Because he wanted Deborah to die, he held his hand over her mouth and nose to prevent her from breathing. Within a minute, Deborah made some gurgling noises and foam came out of her mouth. She was dead. With the knife still in his stomach, Dias lay down beside her. The next morning Dias called 911 and said he had killed his wife and had stabbed himself. When the police arrived, they found Deborah's corpse in the kitchen. Dias was lying beside her. His intestines were protruding from a large gash across his stomach. Dias said he had killed his wife by stabbing and choking her. He

later detailed the facts of the murder in three interviews with the police.

An autopsy revealed that Deborah's death was caused by "multiple penetrating stab wounds to the chest and abdomen." The coroner said that asphyxiation was not a cause of death. She did note, however, that some hemorrhaging in Deborah's eye was common to people dying from asphyxiation.

The State charged Dias with premeditated first-degree murder. Dias did not present any evidence.

## DISCUSSION

### Voluntary Manslaughter

Our first issue questions whether the district court committed reversible error in failing to instruct the jury on voluntary manslaughter as a lesser included offense of first-degree murder. Our standard for reviewing jury instructions informs us to read the instructions as a whole, without isolating any one instruction. The instructions here properly and fairly state the law as applied to the facts in the case. The jury was not misled. See *State v. Mitchell*, 262 Kan. 434, Syl. ¶ 9, 939 P.2d 879 (1997).

At trial, Dias requested an instruction on voluntary manslaughter, which was refused by the district court. In *State v. Moncla*, 262 Kan. 58, 936 P.2d 727 (1997), we recently considered the question of whether an instruction on voluntary manslaughter should have been given in a first-degree murder case. The jury in *Moncla* was instructed on premeditated first-degree murder and second-degree murder, but not voluntary manslaughter. Moncla asserted on appeal that a voluntary manslaughter instruction should have been given. Finding no error, we quoted *State v. Bailey*, 256 Kan. 872, 886, 889 P.2d 738 (1995) (quoting *State v. Guebara*, 236 Kan. 791, Syl. ¶ 2, 696 P.2d 381 [1995]):

" ' "In order for a defendant charged with murder to be entitled to a jury instruction on voluntary manslaughter because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation." ' " *Moncla*, 262 Kan. at 74.

Dias acknowledges that "the important question here is whether there was sufficient evidence of provocation to support an instruction on voluntary manslaughter." Dias admitted to police that he "lost it" after Deborah told him she did not want to reconcile. The only wounds he sustained during the encounter with Deborah were self-inflicted. Deborah did not struggle. She said, "I don't believe you would do this," as she was stabbed. Dias also acknowledges that words alone are not sufficient provocation.

The jury was instructed on both first and second-degree murder. Had the jury believed Dias acted on impulse, they could have convicted him of second-degree murder.

The record here contains no evidence of provocation. The district court correctly concluded that Dias was not entitled to an instruction on the lesser included offense of voluntary manslaughter.

## The Non-PIK, *Allen*-Type Instruction

The district judge advised counsel during the instructions conference that he would give Jury Instruction No. 9, a non-PIK version similar to what is known as an *"Allen"* instruction. See *Allen v. United States*, 164 U.S. 492, 501-02, 41 L.Ed. 528, 17 S. Ct. 154 (1896). The PIK version is at PIK Crim. 3d 68.12. Dias' counsel objected, "Only that's not PIK." The judge responded, "I believe it properly states the law." The instruction was part of the group of instructions given before the jury retired. The State points out that it was not unduly emphasized. The jury deliberated for less than 48 minutes. Jury Instruction No. 9 provided:

"A juror is an officer of the Court and it is the duty of the jury to work out justice for the parties within the law and the evidence.

"In your deliberations you should lay aside mere pride of opinion and should bear in mind that the jury room is no place for advancing theory or cause for either side of a case not arising from the evidence. The aim to be kept in view by the jury is the truth as you find it to be from the evidence presented, considered with the instructions of the Judge.

"It is the duty of the jury to consider the evidence and instructions together and listen to the arguments of each other with an open mindedness and disposition to be convinced by them. If at any time, after such consideration of the evidence

and the instructions, a juror is convinced that his or her vote is wrong, it then becomes the duty of such juror to change his or her vote."

As we said in *Moncla,* and in so many past cases with the hope that non-PIK, individually crafted instructions will be afforded, at best, archival status:

"The use of PIK instructions is not mandatory but is *strongly recommended.* The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." (Emphasis added.) 262 Kan. 58, Syl. ¶ 5.

See *State v. Wilson,* 240 Kan. 606, 609-10, 731 P.2d 306 (1987).

The district judge should perform the task of crafting instructions with PIK accompaniment, not a cappella.

Dias complains that Instruction No. 9 does not contain the following PIK Crim. 3d 68.12 language:

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision."

He argues that Jury Instruction No. 9 "goes too far in telling the jurors to surrender their opinions or convictions about the case to the opinions of others." Dias argues the instruction caused undue prejudice because he was charged with premeditated first-degree murder, although second-degree murder and voluntary manslaughter were other possible theories. He contends the instruction caused the jury to abandon differences of opinion on those other theories.

Dias acknowledges that we examined language similar to Instruction No. 9 in *State v. Whitaker,* 255 Kan. 118, 125, 872 P.2d 278 (1994), and found no reversible error under the "clearly erroneous" standard of review. However, in *Whitaker* there was no contemporaneous objection. Dias reasons a stringent standard of

review applies because he made a contemporaneous objection. We agree.

Because of Dias' instruction challenge, our standard of review requires us to consider Instruction No. 9 along with all instructions, without isolating No. 9, to see if the instructions sufficiently inform the jury of the law of this case. If the jury could not reasonably have been misled, then there is no reversible error although an instruction may be in some small way erroneous. *State v. Hunt*, 257 Kan. 388, 392, 894 P.2d 178 (1995) (citing *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 [1993]). We believe that although No. 9 is poorly worded, the instructions as a whole properly and fairly state the law as applied to the facts here. The jury could not reasonably have been misled by the instructions. *State v. Aikins*, 261 Kan. 346, Syl. ¶ 25, 932 P.2d 408 (1997).

Usually, the primary concern with an *Allen*-type instruction is its timing. When given before jury deliberation, as in this case:

"[A]ll question with regard to the coercive effect of the same would be removed. The practice of lecturing a jury in a criminal case after it has reported a failure to agree is not to be commended and . . . might well be held coercive and erroneous as invading the province of the jury." *State v. Oswald*, 197 Kan. 251, 261, 417 P.2d 261 (1966).

The evidence was overwhelming. Dias made three confessions: the tape of his 911 call to the police dispatcher the morning after the murder and his two taped statements to the police during the murder investigation. Deborah, a certified public accountant, kept two diaries covering approximately the 12-month period immediately preceding her death. Her meticulous notes reflected Dias' almost daily verbal abuse during the months before she filed for divorce. She recorded his inability to hold down a job, his anger at her for working too much, his repeated telephone calls to her at work, his excessive demands at home, her despair over their finances and dread of returning home at night, her decision to go on with the divorce, her relief after Dias had been moved out, and her hope for a better life after the divorce action was filed.

The exhibits also included the carving fork Dias used, photographs of Deborah's clothes showing the puncture points, and autopsy photographs. Deborah's sister testified about helping Deb-

orah when Dias was served with the divorce papers. The locks had been changed and the sister and her friend had helped Deborah move Dias' personal belongings out to a flatbed truck. Dias yelled and screamed, tried to kick in the front and back doors, and finally left after the police had been called. Deborah was extremely frightened throughout the ordeal.

## Abuse of Discretion—The Sister's Testimony

Karen Comeau testified about a sack of Dias' belongings that she did not think Dias should have had. Dias' counsel objected for irrelevance, approaching the bench for an off-the-record discussion. The prosecutor continued with her line of questioning. The record does not reveal whether the judge sustained or overruled the objection. However, he must have overruled it for the questioning to have continued. Karen described the contents of the bag: Dias' knives. Karen told Deborah that she did not think Dias should have the knives, and Deborah agreed. The sack was taken to the barn. At that point, Dias' counsel objected again for irrelevance, and the objection was sustained.

"The admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view." *State v. Baacke*, 261 Kan. 422, Syl. ¶ 1, 932 P.2d 396 (1997).

Dias asserts that he was denied a fair trial because the admission of the testimony concerning his knives was an improper character attack. He contends that his statutory rights under K.S.A. 60-447 have been violated. Because possession of a switchblade knife is a violation of K.S.A. 21-4201(a)(1), Dias argues this testimony is prior crimes evidence, improper under K.S.A. 60-455. Dias reasons that he did not put his character in issue.

Karen's testimony about Dias' knives was irrelevant but brief, and the district court sustained the objection as the testimony continued. It did not affect the outcome of the trial, given the overwhelming evidence and Dias' admitted use of the knife and carving fork during the crime. We find no abuse of discretion.

## The Hard 40 Sentence

At sentencing, the State argued that Dias should receive a K.S.A. 21-4635 hard 40 sentence because he committed the crime in an especially heinous, atrocious, or cruel manner. The State emphasized the slow manner of Deborah's death over a 3- to 4-minute time period, her stab wounds, her consciousness throughout the ordeal, her knowledge that she was dying, and her fear about what else would happen to her as she watched Dias kneel over her with a knife, stab himself, and then place his hand over her mouth to stop her breathing.

Dias' counsel argued that four mitigating factors were present: (1) Dias had no significant criminal history; (2) the crime was committed while he was under the influence of extreme mental or emotional disturbances; (3) Dias acted under extreme stress; and (4) he lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

The sentencing court found that the aggravating circumstance urged by the State was present, and found only one mitigating factor to exist: lack of significant criminal history.

Dias contends that there was insufficient evidence to support the aggravating circumstance. We compare the facts here to three recent cases in which the same aggravating circumstance was found and the hard 40 sentence affirmed. *State v. Brady*, 261 Kan. 109, 929 P.2d 132 (1996) (while two victims lay on the floor, Brady first shot one in the head and then shot the other in the head); *State v. Alford*, 257 Kan. 830, 896 P.2d 1059 (1995) (victim was shot at work several times as she attempted to escape); and *State v. Gideon*, 257 Kan. 591, 894 P.2d 850 (1995) (The victim was forced to stand naked in a field, was told either her murderer or she would die, and was then strangled to death). In all of these cases, the victim was alive for some time period, knowing death was imminent. The circumstances of Deborah's slow, torturous death are at least as heinous, atrocious, and cruel as in any of the above cases. We uphold the imposition of the hard 40 sentence.

Affirmed.

LOCKETT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.