(36 P.3d 305)
No. 82,636
No. 82,637

STATE OF KANSAS, *Appellee*, v. SCOTT M. ARCULEO, *Appellant*.

Opinion filed November 30, 2001.

*Patrick H. Dunn*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

No appearance for the appellee.

Before PIERRON, P.J., MARQUARDT and BEIER, JJ.

PIERRON, J.: Scott M. Arculeo appeals his convictions in two Lyon County cases. In 97CR350, he was convicted by a jury of one count of rape, two counts of aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child. In 97CR180, he was convicted on stipulated facts to the court of three counts of aggravated criminal sodomy, four counts of sexual exploitation of a child, and one count of criminal possession of a firearm. The cases were consolidated on appeal.

On May 20, 1997, Officer Mark Senn of the Emporia Police Department responded to a report of a domestic dispute at Arculeo's apartment. When he arrived on the scene, Officer Senn found Darlene Murdock, Arculeo's common-law wife, lying in the street and emotionally upset. Murdock told Officer Senn she had been thrown out of her house, had no money, and knew no one in town. Officer Senn stated Murdock had suicidal ideation and pursuant to department policy, he took her to the hospital for a mental evaluation. During the 2½ hours the two sat in the hospital waiting room, Murdock made statements which formed the basis of the affidavit for the search of Arculeo's apartment.

Murdock told Officer Senn that within the last 2 weeks Arculeo had allowed two females to live with them. She said Arculeo gave one of the females $250 to buy some illegal drugs. Murdock ad-

mitted to using some of the drugs after the female returned to the apartment. Murdock told Officer Senn the female had the drugs in a briefcase. She said they did not use all the drugs and the remainder was being stored in Arculeo's personal safe in his bedroom or in the briefcase. Murdock also said Arculeo liked to use a video camera and that he may have videotaped some of the drug use incidents.

Officer Senn obtained a search warrant based on the information received from Murdock. During execution of the search warrant and a search of Arculeo's personal safe, officers discovered several videotapes, photographs of nude or semi-nude young boys, and rolls of 35 mm film and instamatic film. The officers also found a briefcase with a zip lock bag inside containing a white powdery substance, several smoking pipes, rolling papers, a plastic bag containing vegetation, and a gun under Arculeo's bed. Upon viewing the videotapes, officers discovered pornographic material of young boys involved in sexual activity, including sexual activity with Arculeo and with both Arculeo and Murdock.

On May 27, 1997, Arculeo was arrested and charged in Case No. 97CR180 with multiple counts of aggravated criminal sodomy, aggravated indecent liberties with a child, sexual exploitation, sexual exploitation of a child, and criminal possession of a firearm. The children involved in 97CR180 were P.G., D.R., D.G., and M.M. As information of the case became public, other victims came forward. On August 27, 1997, Arculeo was charged in Case No. 97CR350 with rape of a child under 14 years, two counts of aggravated criminal sodomy, and two counts of aggravated indecent liberties. The children involved in 97CR350 were A.G., M.M., M.W., and K.G.

Although 97CR180 was scheduled for trial before 97CR350, due to repeated continuances of 97CR180, a jury trial in 97CR350 occurred first. Each of the four victims, A.G., M.M., M.W., and K.G., testified to the sordid details of Arculeo's sexual abuse when they would spend the night at his house. The jury found Arculeo guilty on all counts. The trial court granted the State's request for an upward departure based on the following factors:

"(1) Defendant's acts were part of a comprehensive scheme to sexually abuse and record the abuse of minor children perpetrated over a significant period of time as opposed to isolated acts; (2) Defendant's acts involved the intentional cultivation of intense personal relationships designed to promote defendant's access to minor children; (3) Defendant manipulated parents of children in order to gain access to children to satisfy his deviant sexual appetite."

On August 25, 1998, the trial court sentenced Arculeo to consecutive sentences of 231 months' incarceration for rape, 115 months' incarceration for each of the aggravated criminal sodomy convictions, and 76 months' incarceration for each of the aggravated indecent liberties convictions. However, the trial court reduced the entire sentence to a total period of incarceration of 462 months in order to conform to the limits set by the Kansas Sentencing Guidelines Act. See K.S.A. 2000 Supp. 21-4720(c)(3).

The same day he was convicted in 97CR350 (August, 25, 1998), Arculeo filed a request for a bench trial on stipulated facts in 97CR180. The trial court granted the request and ultimately found Arculeo guilty on 8 of the 13 charges. Arculeo requested a downward durational departure, arguing that since the proceedings in 97CR180 and 97CR350 were tried separately, his criminal history score was now the highest possible category ("A"), when it would have been substantially less had the cases been joined. The court denied Arculeo's departure motion and sentenced him to the presumptive sentences for the crimes in 97CR180. The court sentenced Arculeo to consecutive sentences as follows: aggravated criminal sodomy, 308 months; 34 months on each of the four convictions for sexual exploitation; 77 months on each of the remaining two convictions for aggravated criminal sodomy; and 9 months for criminal possession of a firearm. The trial court sentenced Arculeo to a total period of incarceration of 505 months. The sentence was ordered to run consecutive to the 462 months imposed in 97CR350 and to the sentences in a long list of other cases where he was on probation for burglaries and thefts. The total sentence appears to be something in the area of 100 years.

Arculeo appeals his convictions in both 97CR180 and 97CR350. The cases were consolidated on appeal.

*Omissions from the Search Warrant Affidavit*

Arculeo first argues evidence seized from his house was illegally obtained because the affidavit supporting the original search warrant deliberately omitted material facts concerning the reliability of the informant. He points out the affidavit for the search warrant omitted evidence that Officer Senn: (1) found Murdock lying in the middle of the street when he responded to the domestic call and that she had suicidal ideation; (2) was aware of Murdock's mental and intellectual handicap and Murdock gave the incriminating statements while she was waiting for a mental health center evaluation at a hospital emergency room; (3) noticed Murdock had subpar intelligence and she appeared easily persuaded; and (4) was aware the Women's Resource Center assisted Murdock with her finances. Arculeo argues if this additional information had been included in the affidavit, a judge could not have found sufficient probable cause for the issuance of the search warrant due to the serious questions as to Murdock's reliability.

At the hearing on Arculeo's motion to suppress, Officer Senn admitted he knew the omitted information when he requested the affidavit, but he did not put it in his application because he felt the information did not have any bearing on the search warrant. The State argued the omission of those facts would not have prevented the magistrate from finding probable cause to issue the search warrant.

In denying Arculeo's suppression motion, the trial court found there was no evidence any of the information in the application was incorrect. The court also found the informant was the common-law wife of the defendant and her statements of personal drug use with the defendant provided corroboration for her statements and added veracity to their reliability. The court concluded the totality of the circumstances provided probable cause for issuance of the search warrant and the evidence would cause a reasonable person to believe criminal activity was occurring in the defendant's apartment. We agree.

K.S.A. 22-2502 provides that a search warrant shall be issued upon oral or written application "which states facts sufficient to

show probable cause that a crime has been or is being committed." Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt. *State v. Abu-Isba*, 235 Kan. 851, 853-54, 685 P.2d 856 (1984).

While generally a defendant may not dispute allegations supporting a search warrant, a hearing under *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), is required if a defendant makes a showing supported by sworn allegations that the application for the search warrant contained material statements of deliberate falsehood or of reckless disregard for the truth which were necessary to the finding of probable cause. *State v. Jensen*, 259 Kan. 781, 787, 789, 915 P.2d 109, *cert. denied* 519 U.S. 948 (1996). The same rule applies to a deliberate omission of material information. *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982). While Arculeo never specifically requested a *Franks* hearing, the motion to suppress was, in effect, a *Franks* hearing. A *Franks* hearing is simply an evidentiary hearing on a motion to suppress evidence based on a challenge to the facts included or omitted from a search warrant. See *State v. Jacques*, 225 Kan. 38, 44, 587 P.2d 861 (1978).

Where, as here, information is omitted from an application for a search warrant, it should be determined whether the omission was material and whether it rendered the affidavit unreliable. *State v. Cowdin*, 25 Kan. App. 2d 176, 181, 959 P.2d 929, *rev. denied* 265 Kan. 887 (1998). In other words, would the judge in the instant case who issued the search warrant have had probable cause to do so had he been informed of the omissions claimed by Arculeo.

Arculeo does not challenge the probable cause supporting the original search warrant. The affidavit clearly sets forth evidence that Murdock saw drugs in the house, used drugs with the defendant, and saw drugs that had been purchased within the last 2 days; that Arculeo may have videotaped the incidents of drug use; and that the tapes and remaining drugs were in Arculeo's personal safe. Instead, Arculeo argues the information omitted by Officer Senn would have affected the magistrate's probable cause determination

and we should reverse the denial of his suppression motion. We disagree.

First, the information obtained by Officer Senn came from Arculeo's common-law wife. Arculeo does not dispute his common-law marital status. "When the information in an affidavit for a search warrant is stated to have been obtained from the defendant's spouse, who resides with the defendant in the residence to be searched, no further showing of the witness' reliability is required." 25 Kan. App. 2d 176, Syl. ¶ 2. We also agree with the trial court that Murdock's admitted involvement in the drug activity increased the veracity of her statements.

Second, there is no evidence the omitted information affected the reliability of Murdock's statements. Officer Senn testified there was nothing about Murdock's mental capacity that made him feel her statements were unbelievable. Officer Senn stated that while she seemed "a little slow," he meant that "she seemed like a person that could be persuaded to do things that a normal person would probably stand up for." Further, Murdock told Officer Senn she had graduated from high school and that she knew the difference between right and wrong. Additionally, there is no evidence Murdock's possible retardation or the situation as observed by Officer Senn affected the reliability of Murdock's statements.

We find the search warrant would have reasonably been issued even with the inclusion of the other information and that the officer certainly had a right to rely on it. See *United States v. Leon*, 468 U.S. 897, 918-922, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984) (exclusionary rule should not be applied to bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, even though the warrant is ultimately found to be invalid).

*Compulsory Joinder*

Next, Arculeo argues the trial court erred in denying his motion to dismiss based on his claims of compulsory joinder and that prosecution of 97CR180 was barred by evidence presented at sentencing in 97CR350.

K.S.A. 21-3108 provides:

"(2) A prosecution is barred if the defendant was formerly prosecuted for a different crime, or for the same crime based upon different facts, if such former prosecution:

(a) Resulted in either a conviction or an acquittal and the subsequent prosecution is for a crime or crimes of which evidence has been admitted in the former prosecution and which might have been included as other counts in the complaint, indictment or information filed in such former prosecution or upon which the state then might have elected to rely; or was for a crime which involves the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution, or the crime was not consummated when the former trial began."

K.S.A. 21-3108 is a codification of the double jeopardy rule and contains two parts, the "compulsory joinder" rule and the "identity of elements" rule. *In re Berkowitz*, 3 Kan. App. 2d 726, 741, 602 P.2d 99 (1979). Under the compulsory joinder rule, if evidence is admitted of an offense not contained in the charge, later prosecution of that offense is barred if it could have been included as an additional count in the first prosecution. 3 Kan. App. 2d at 742.

The object of the compulsory joinder rule is simply to prevent the prosecution from substantially proving a crime in a trial in which that crime is not charged, and then prosecuting the defendant in a subsequent trial using evidence presented in the earlier trial. 3 Kan. App. 2d at 743. The compulsory joinder rule furthers the constitutional guarantee against multiple trials and is not concerned with multiple convictions or multiple punishments for separate offenses. 3 Kan. App. 2d at 734.

Kansas courts utilize a three-prong test when determining whether the compulsory joinder rule applies. As Chief Judge Foth stated in *Berkowitz*:

"For the Kansas statute [K.S.A. 21-3108] to bar a prosecution under the circumstances present in this case three elements must coalesce: (1) The prior prosecution must have resulted in either a conviction or an acquittal; (2) evidence of the present crime must have been introduced in the prior prosecution; and (3) the present crime must be one which could have been charged as an additional count in the prior case." 3 Kan. App. 2d at 743.

In the present case, there is really no argument concerning satisfaction of the first and third prongs of the *Berkowitz* test. Under the first prong, Arculeo was convicted on all five counts in 97CR350. Under the third prong, there was nothing stopping the

State from amending the complaint in 97CR180 to include the charges in 97CR350, or vice versa. The events involved similar sexual conduct and the State could easily have brought the cases together. See *State v. Anthony*, 257 Kan. 1003, 1016, 898 P.2d 1109 (1995) (joinder may be proper under K.S.A. 22-3203[1] if the charges are based on two or more transactions connected together or constituting parts of a common scheme or plan). All the cases in 97CR350 and 97CR180 were felonies occurring in Lyon County and could have been charged in the same complaint under K.S.A. 22-3202.

At the hearing on the motion to dismiss, the State argued Arculeo could have requested a joinder of the claims under K.S.A. 22-3203(1) and it was his tactical decision to "roll the dice" by keeping the charges separate in order to potentially benefit from an acquittal in the first trial.

There is not a burden on either the defense or the prosecution to bring a motion for joinder under K.S.A. 22-3203. While the decision to keep cases separate is a roll of the dice for either party, it is the prosecution that is restricted under K.S.A. 21-3108 with regard to the effect of a former prosecution upon remaining crimes. Under K.S.A. 21-3108, the prosecution must be careful that no significant evidence of the subsequent case is presented in the prosecution of the first case.

The issue in this case is whether the evidence of 97CR180 presented at *sentencing* in 97CR350 was sufficient to trigger application of the second prong of the *Berkowitz* test. The factual aspect of the second prong is clearly met. There can be no doubt the evidence of sexual exploitation of the children in 97CR180 came into evidence during the departure hearing in 97CR350. The State called Detective John Cronk of the Emporia Police Department to testify on the State's motion for an upward durational departure. Detective Cronk stated he was called to specifically testify concerning the evidence to be used at trial in 97CR180. Detective Cronk testified about all the videotapes and photographs discovered in the search of Arculeo's apartment. He then gave a detailed and explicit rendition of the evidence of sexual activity found on each of the 6 videotapes to be used in 97CR180. Detective Cronk

also described in detail the 14 photographs of nude young boys found in Arculeo's apartment. It is undisputed that with one exception, none of the victims in the videotapes were the same victims in 97CR350. The exception is that M.M., who was a victim in both cases, was on one of the videotapes, but Detective Cronk testified there was no sexual contact shown.

During argument on the departure motion, the prosecutor stated the reason for presentation of the evidence of the crimes in the yet-to-be tried case of 97CR180 was to show that Arculeo had molested 5 other children, bringing the number of child victims to a total of 9.

As stated above, K.S.A. 21-3108 is a codification of the double jeopardy rule, which prevents multiple punishments for the same offense, found in the Fifth and Fourteenth Amendments to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. See *State v. Thompkins*, 271 Kan. 324, Syl. ¶ 4, 21 P.3d 997 (2001). The present case offends the double jeopardy rule. Not only was evidence of the crimes in 97CR180 presented to the trial court at sentencing in 97CR350, but the yet-to-be-tried crimes were utilized by the trial court to enhance Arculeo's sentence as an upward departure factor. The first departure factor adopted was: "(1) Defendant's acts were part of a comprehensive scheme to sexually abuse and record the abuse of minor children perpetrated over a significant period of time as opposed to isolated acts." None of the crimes in 97CR350 were recorded on videotape or depicted in the pictures found in Arculeo's apartment.

The majority of cases dealing with the compulsory joinder rule brought on by a prior prosecution in K.S.A. 21-3108 involve situations where evidence is presented during trial or during a plea hearing. See, *e.g., State v. Wilkins*, 269 Kan. 256, 261, 7 P.3d 252 (2000); *State v. Barnhart*, 266 Kan. 541, 542, 972 P.2d 1106 (1999); *State v. Todd*, 262 Kan. 916, 941 P.2d 1374 (1997). The legal question presented by the second prong of the *Berkowitz* test is whether evidence of crimes admitted at a sentencing hearing, which is presented to enhance the defendant's sentence, constitutes introduction of evidence in a "prior prosecution" if those other crimes are prosecuted at a later time. We believe it does.

Black's Law Dictionary 1221 (6th ed. 1990) defines "prosecute" as follows: "To follow up; to carry on an action or other judicial proceeding; to proceed against a person criminally. To 'prosecute' an action is not merely to commence it, but includes following it to an ultimate conclusion." Arculeo cites *State v. Bowles*, 70 Kan. 821, 827, 79 Pac. 726 (1905), where the court held:

"In the American and English Encyclopedia of Law (2d ed.), volume 23, page 268, there is a fair statement of what is included in the term 'prosecute.'

'To prosecute is to proceed against judicially. A prosecution is the act of conducting or waging a proceeding in court; the means adopted to bring a supposed offender to justice and punishment by due course of law. It is also defined as the institution or commencement and continuance of a criminal suit; the process of exhibiting formal charges against an offender before a legal tribunal, and pursuing them to final judgment on behalf of the state or government, as by indictment or information.' "

The sentencing phase of a criminal proceeding clearly constitutes a proceeding in the "prosecution" of a criminal case. The sentencing of a defendant is the culmination of a criminal prosecution. Further, the sentencing hearing is a critical phase of a criminal proceeding, requiring the presence of the defendant. K.S.A. 2000 Supp. 22-3405; *State v. Braun*, 253 Kan. 141, 145-47, 853 P.2d 686 (1993). Also, we agree with Arculeo that sentencing hearings have become trials within trials because of the Kansas Sentencing Guidelines Act, and the resolution of departure motions now usually filed by either one or both parties.

We find the State's presentation of the evidence in 97CR180 at the sentencing hearing in 97CR350 was covered by the compulsory joinder rule in K.S.A. 21-3108. The State was prohibited from prosecuting Arculeo in 97CR180 after those unproven crimes had been used to enhance his punishment in 97CR350. The trial court erred in denying Arculeo's motion to dismiss 97CR180. We reverse the conviction in 97CR180 and order the trial court to grant a dismissal of those charges as a violation of Arculeo's double jeopardy right.

*Multiple Acts Unanimity Instruction*

Next, Arculeo argues the trial court erred in failing to instruct the jury on a unanimous verdict. Our standard of review for determining whether a defendant is entitled to a new trial in a mul-

tiple acts case because the jury was not given a unanimous verdict instruction has been unsettled until recently.

Panels of the Court of Appeals have fallen into two camps. In the structural error approach, our court has held that a trial court's failure to give a unanimous verdict instruction in the appropriate circumstances was structural error and required automatic reversal. See *State v. Wellborn*, 27 Kan. App. 2d 393, Syl. ¶ 2, 4 P.3d 1178, *rev. denied* 269 Kan. 940 (2000); *State v. Barber*, 26 Kan. App. 2d 330, 331, 988 P.2d 250 (1999).

In the other camp, our court has applied a harmless error analysis. See *State v. Hill*, 28 Kan. App. 2d 28, 11 P.3d 506 (2000), *aff'd* 271 Kan. 929, 26 P.3d 1267 (2001).

In its review of *Hill*, the Supreme Court noted the diversity of precedent in the area and then adopted a two-step harmless error analysis:

"In applying a harmless error analysis, the first step is to determine whether there is a possibility of jury confusion from the record or if the evidence showed either legally or factually separate incidents . . . . When jury confusion is not shown under the first step, the second step is to determine if the error in failing to give an unanimity instruction was harmless beyond a reasonable doubt with respect to all acts." 271 Kan. at 939.

In *Hill*, the problem arose when the victim testified at trial, unexpectedly, that two digital rapes occurred during the incident instead of just one. The jury instructions did not specifically separate the two acts. As Justice Six noted:

"[M]ore than one act was presented as evidence of a single criminal offense. Here, materially identical evidence was presented with respect to both acts of rape. Hill did not present a separate defense or offer materially distinct evidence of impeachment regarding any particular act. The defense presented a general denial of participation in any wrongful conduct.

"[J]ury confusion was not shown here. In applying a harmless error review, since there was no extrinsic evidence to support the charges, the sole issue was the credibility of the victim's account of the two alleged penetrations. The evidence offered no possibility of jury disagreement regarding Hill's commission of either of these acts. By the jury's rejection of Hill's general denial, we can unequivocally say there was no rational basis by which the jury could have found that Hill committed one rape but did not commit the other." 271 Kan. at 940.

As Justice Six noted earlier in *Hill*:

" 'In those cases in which the defense to charges based on multiple acts is a general denial, differentiation among a number of events is not required of the jury and therefore is not an issue in controversy. The jury either accepts the victim's testimony as to all and convicts, or it accepts the defendant's denial and acquits on all charges. The failure to give a unanimity instruction in those instances is harmless error; it does not relate to an issue in controversy.' Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 Gonzaga Law Review 277, p. 302 (1996)." 271 Kan. at 938-39.

In the instant case the facts in Counts II and III of 97CR350 charge factually separate incidents. The Court of Appeals stated in *Hill*: "Incidents are factually separate when independent criminal acts have occurred at different times or when a subsequent criminal act is motivated by 'a fresh impulse.' " 28 Kan. App. 2d 28, Syl. ¶ 4. We are dealing with a multiple acts case.

The case at bar demonstrates the difficulty of requiring a specific election or jury agreement where the evidence shows repeated sexual abuse of a young child over a long period of time. M.M.'s description of the alleged abuse offered no distinguishing characteristics identifying any separate and distinct incidents of abuse. Rather, the abuse "result[ed] in an amalgamation of the crimes in the child's mind"; thus, "the child's testimony [was] reduced to a general, and customarily abbreviated, recitation of what happened on a continuing basis." *People v. Luna*, 204 Cal. App. 3d 726, 748, 250 Cal. Rptr. 878 (1988).

Arculeo's due process right to a reasonable opportunity to defend against the charges was not violated. The sole issue was credibility. The generic nature of the evidence did not raise a question as to the sufficiency of that evidence. While the jury was not provided any evidence as to the frequency of the alleged crimes, *e.g.*, once a month for 4 months, none was necessary because the appellant was charged with only one count of aggravated criminal sodomy and one count of aggravated indecent liberties with a child. Moreover, M.M. gave sufficiently specific evidence of the sexual acts. The jury could have reasonably concluded from M.M.'s testimony that his account could have come only from personal experience.

Furthermore, Arculeo's right to jury unanimity was not endangered. Although the evidence indicated that the incidents of sexual acts occurred more than the one time charged, the evidence in its entirety offered no possibility of jury disagreement regarding Arculeo's commission of any of these acts. The only issue before the jury was the credibility of M.M.'s account of the repetitive sexual offenses alleged. By the jury's rejection of Arculeo's general denial, the appellant has his unanimous jury verdict.

The above analysis and facts as presented make this case an appropriate subject for the harmless error rule. "[E]rrors that do not affirmatively cause prejudice to the substantial rights of the complaining party do not require reversal when substantial justice has been done. [Citation omitted.]" *State v. Clark*, 263 Kan. 370, 376, 949 P.2d 1099 (1997). Any error in not having the prosecution elect a crime or instructing the jury on unanimous verdict was harmless error. In *State v. Jones*, 51 Cal. 3d 294, 307, 270 Cal. Rptr. 611, 792 P.2d 643 (1990), the court observed that "[s]ome cases found harmless any error in failing either to select specific offenses or [to] give a unanimity instruction, if the record indicated the jury resolved the basic credibility dispute against the defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed."

As in the case of *R.L.G., Jr. v. State*, 712 So. 2d 348 (Ala. Crim. App.1997), the present case was decided on the issue of credibility. The defense was that the incidents did not occur. There was no logical way the jury could have found Arculeo committed one of the incidents but not the others. Any juror believing that one incident took place would have believed that all the incidents took place. No rational juror could have had a reasonable doubt as to any of the incidents involved. By returning guilty verdicts, the jurors necessarily rejected Arculeo's defense. By believing the victim, the jury unanimously found that all the incidents occurred.

Under these circumstances, the jury agreed on the acts forming the basis for the verdicts. Arculeo's rights to notice of the charges against him and to be convicted only upon sufficient proof of those acts were preserved. The trial court's failure to give a specific una-

nimity instruction due to the prosecution's failure to specifically elect particular acts was harmless error.

*Definition of Sodomy*

Next, Arculeo argues the trial court erred in giving the jury a non-PIK instruction on the definition of sodomy. There was no objection to the instruction now complained of on appeal.

Arculeo's complaints involve jury instruction No. 18. Both the State and defense counsel submitted proposed jury instructions. The trial court used a slightly modified version of the State's instruction on the definition of "Sodomy." Instruction No. 18 provided: "As used in these instructions 'sodomy' means having oral or anal sexual relations between persons, including oral-genital stimulation between the tongue of a male and the genital area of a male or female."

Arculeo argues the court's definition of sodomy is confusing and misleading and allows noncriminal conduct to constitute sodomy. He also contends the second half of the instruction improperly highlighted the testimony of one of the child victims, M.W., and validated it in the eyes of the jury.

Our standard of review under these facts is clear:

"[N]o party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

We find no significant error and surely no reversible error.

Sodomy is defined in K.S.A. 21-3501(2) as "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal." PIK Crim. 3d 57.18(B)(d)(1) and (4) follow the statutory definition of sodomy by instructing that sodomy is: "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; . . . anal penetration, however slight, of a male or female by any body part or object."

It is obvious the trial court in this case relied on the definition of sodomy found in PIK Crim. 2d 57.18(B)(d)(1) (1992 Supp.), which provided: " 'Sodomy' means: (1) having oral or anal sexual relations between persons, including oral-genital stimulation between the tongue of a male and the genital area of a female." Further, the State's proposed instruction on sodomy follows PIK Crim. 2d 57.18(B)(d)(1) (1992 Supp.) almost identically. The PIK Crim. 2d 57.18 instruction for sodomy clearly addressed the statutory definition as found in the 1990 formulation. K.S.A. 1990 Supp. 21-3501(b)(2) stated: " 'Sodomy' means oral or anal copulation, including oral-genital stimulation between the tongue of a male and the genital area of a female." The legislature amended the definition of sodomy in 1991 to its current form. It seems the PIK Crim. 2d instruction for sodomy as "oral or anal sexual relations between persons" was intentionally not a recitation of the 1990 statute, but was an attempt to explain the statutory language in K.S.A. 1990 Supp. 21-3501(b)(2)—"oral or anal copulation."

We find no error in the trial court's use of the earlier language in PIK Crim. 2d 57.18(B)(d)(1) (1992 Supp.). " 'The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Dias*, 263 Kan. 331, 335, 949 P.2d 1093 (1997)(quoting *State v. Moncla*, 262 Kan. 58, Syl. ¶ 5, 936 P.2d 927 [1997]). We do not find the difference in defining sodomy in PIK Crim. 2d rather than in PIK Crim. 3d to be reversible error. The jury instructions were not clearly erroneous. See *Henry*, 263 Kan. at 131. We do not believe the jury would have rendered a different verdict had the alleged error in jury instructions not occurred.

We also do not find that the sodomy instruction gave undue emphasis to M.W.'s testimony that Arculeo "licked [her] private." The trial court did not pull the language "including oral-genital stimulation between the tongue of a male and the genital area of a male or female" out of a hat. As previously stated, this language came from K.S.A. 1990 Supp. 21-3501(b)(2) and PIK Crim. 2d 57.18(B)(d)(1) (1992 Supp.). The jury instruction simply expressed the State's theory on how Arculeo committed the crime of aggra-

vated criminal sodomy. It was up to the jury to decide if it happened.

Arculeo relies on *State v. Jones*, 3 Kan. App. 2d 553, 598 P.2d 192 (1979), to support his argument that an instruction may not provide undue emphasis to a specific piece of evidence. We do not find Arculeo's reliance on *Jones* to be persuasive. In fact, the *Jones* court specifically stated that had the only error been the alleged erroneous jury instruction, the court would have considered it harmless since "the instruction as given is no grave departure from the accepted form of the instruction [approved in previous cases and in review of the jury instructions as a whole]." 3 Kan. App. 2d at 555.

The jury instructions properly instructed the jury and were a fair statement of the law. The jury could not have been reasonably misled by the instructions even though they may be in some way erroneous. See *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

### Prosecutorial Misconduct

Next, Arculeo argues the State's attorney committed prosecutorial misconduct in closing argument when he vouched for the credibility of the child victims. There was no objection at trial to the State's comment.

Kansas does not ordinarily apply the plain error rule. Reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument if a contemporaneous objection is not made. If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *State v. Lumley*, 266 Kan. 939, 964-65, 976 P.2d 486 (1999).

Arculeo objects to the following comments by the prosecutor during closing argument:

"Can they say, well, do children lie? Well, do adults lie? People lie. You have to weigh that. Are these children, each individual child, lying about this incident? Ladies and gentleman, I would submit to you they are not. We have to prove

beyond a reasonable doubt as to the claims proven—or required by law. The evidence shows that, unrefuted evidence. Thank you."

Arculeo contends he was denied a fair trial because of the prosecutor's statements in conjunction with the evidence that one of the child victims, A.G., had previously falsely accused her stepfather of masturbating in front of her in order to get him out of the house.

Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994); *State v. Mosley*, 25 Kan. App. 2d 519, Syl. ¶ 3, 965 P.2d 848, *rev. denied* 266 Kan. 113 (1998).

In this case, the prosecutor's comments were not so gross and flagrant as to prejudice the jury against Arculeo and deny him a fair trial. This case does not present a situation where the prosecutor improperly vouched for the credibility of a witness. The court in *State v. Martens*, 521 N.W.2d 768, 772 (Iowa App. 1994), stated: "An argument amounts to impermissible vouching if the jury could reasonably believe the prosecutor was expressing a personal belief in the credibility of a witness, either through explicit personal assurances or implicit indications that information not presented to the jury supports the witness."

The comments here were well within the considerable latitude given to a prosecutor in arguing a case to a jury. See *State v. Spresser*, 257 Kan. 664, 669-70, 896 P.2d 1005 (1995) (in summing up a case to the jury, the prosecutor may make reasonable inferences drawn from the evidence). We find no reversible error, if error at all.

### Change of Venue

For his last argument, Arculeo contends the trial court abused its discretion in denying the motion for change of venue. He argues

the jury pool was irreparably tainted as a result of unfair media coverage of his case.

Change of venue is governed by K.S.A. 22-2616. Subsection (1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

The principles underlying a motion for a change of venue were reviewed in *State v. Ruebke*, 240 Kan. 493, Syl. ¶¶ 1-3, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), where the court said:

"Media publicity alone has never established prejudice per se."

"The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985)."

"The defendant must show that such prejudice exists in the community that it was reasonably certain he could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant. *State v. Sanders*, 223 Kan. 273, 280, 574 P.2d 559 (1977)."

Initially, we recognize Arculeo waived any right he had to appeal the court's decision denying his motion for change of venue. Arculeo filed his motion for change of venue in Case No. 97CR180. He did not file a motion for change of venue in Case No. 97CR350. Due to repeated continuances in 97CR180, the trial in 97CR350 occurred first. After his conviction in 97CR350, Arculeo's request for a bench trial on stipulated facts in 97CR180 was granted. The lack of a jury trial in 97CR180 eliminated all concerns inherent in a motion for change of venue. K.S.A. 22-2616(1) (court shall order change of venue when satisfied prejudice so great against the defendant that he or she cannot obtain a fair and impartial trial). Arculeo simply cannot show prejudice in the community when he does not have a jury trial.

Even though Arculeo waived his motion for change of venue, we acknowledge the connected nature of 97CR180 and 97CR350 and find that even if the motion for change of venue is considered applicable to both cases, the trial court did not abuse its discretion in denying the motion.

Straightforward reporting of a crime, even if the coverage is extensive, is usually not grounds for a change of venue. See *Patton v. Yount*, 467 U.S. 1025, 1030, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984); *Dobbert v. Florida*, 432 U.S. 282, 303, 53 L. Ed. 2d 344, 97 S. Ct. 2290 (1977); *State v. Grissom*, 251 Kan. 851, 928-29, 840 P.2d 1142 (1992); *State v. Dunn*, 243 Kan. 414, 425-26, 758 P.2d 718 (1988).

In *State v. Gilder*, 223 Kan. 220, 574 P.2d 196 (1977), the defendant was charged with aggravated robbery, aggravated sodomy, and the rape of an elderly woman who stopped at a highway rest stop west of Parsons. The trial was held in "a rather sparsely populated community," as noted by the court. 223 Kan. at 223. In upholding the trial court's denial of the motion for a change of venue, the court stated:

"In this case defendant presented only newspaper articles in support of his motion for change of venue. No evidence or affidavits were introduced to establish the effect publicity might have on prospective jurors. It does not appear that jury selection was inordinately difficult due to pretrial publicity, or that jurors were even aware of the publicity. The trial court properly denied a motion for change of venue under those circumstances." 223 Kan. at 223.

The case of *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), is similar to the small community situation in the present case. In *Hunter*, the defendant and two accomplices were charged with an execution-type slaying of two local men and the wounding of a deputy sheriff and another man. There was extensive pretrial publicity and emotions ran high in the small community. The evidence presented at the hearing on the motion for change of venue consisted of: (1) extensive pretrial media coverage of the crime; (2) phone calls to the sheriff's department threatening the defendants; (3) 14 affidavits from community members stating defendant could not get a fair trial; (4) a petition signed by more than 1,000 people in the county urging the Governor to sign death penalty legislation;

and (5) out of 95 potential jurors, 89 knew at least one of the victims, and of the final jury panel, 5 knew one or more victims. 241 Kan. at 635-36.

The *Hunter* court decided the trial court did not abuse its discretion in denying the defendant's motion for change of venue. The court stated: "[E]ach [juror] stated under oath that he or she would be able to remain fair and impartial. In order to find that defendant has established prejudice, we would have to assume that these jurors violated their oaths; this we cannot do." 241 Kan. at 636.

Arculeo's basic complaint is that the newspaper articles portrayed him as a "drug using kiddie porn kingpin." The court in the early case of *State v. Furbeck*, 29 Kan. 532, 533-34 (1883), with reference to certain newspaper articles being the basis for a change of venue, stated:

"We have examined these articles, and find in them nothing more than ordinary newspaper accounts of an alleged crime, the arrest of the party charged, and the preliminary examination. They are simply records of matters of public interest, alleged to have taken place; they contain no denunciations, invectives, appeals to passion, or efforts to create a prejudice against the defendant. If they did create a prejudice, it is simply because the matters stated therein to have been done by the defendant are not popular with a community which believes in respecting the rights of property."

The facts in this case are similar to those in *Gilder* as far as the evidence presented in conjunction with the motion for change of venue. Arculeo presented evidence in the form of newspaper articles and transcripts from news reports on local radio stations. We have reviewed all the evidence and find it is a fairly factual rendition of the criminal proceedings involving Arculeo and Murdock. As the trial court held below, this evidence simply did not satisfy Arculeo's burden for obtaining a change of venue. Arculeo has presented nothing more than mere speculation. He failed in his burden to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. *State v. Haislip*, 237 Kan. 461 486, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985). We do not find the trial court abused its discretion in denying the motion for change of venue.

We affirm Arculeo's convictions in 97CR350. We reverse the trial court's denial of Arculeo's motion to dismiss in 97CR180 and order the court to reverse the convictions and dismiss the charges in 97CR180. Under the recent decision of *Gould*, we must also remand Arculeo's convictions in 97CR350 for resentencing.

Affirmed in part, reversed in part, and remanded with directions.

BEIER, J., concurring: I concur in the result of the majority opinion. I write separately because I believe the majority falls short in its analysis, critique, and application of *State v. Hill*, 271 Kan. 929, 26 P.3d 1267 (2001), on the multiple acts issue.

The majority is correct that our court had been divided until recently on whether violation of the elect-or-instruct rule for multiple acts cases required reversal for structural error or could be declared harmless error. Compare *State v. Wellborn*, 27 Kan. App. 2d 393, 4 P.3d 1178, *rev. denied* 269 Kan. 940 (2000), with *State v. Hill*, 28 Kan. App. 2d 28, 11 P.3d 506 (2000), *aff'd* 271 Kan. 929, 26 P.3d 1267 (2001). The Supreme Court addressed that controversy in *Hill*, categorically rejecting structural error analysis and adopting virtually word-for-word the two steps set forth originally in the Court of Appeals' opinion in *Hill*. The second of these steps requires a determination of whether any error is harmless beyond a reasonable doubt. *Hill*, 271 Kan. at 939. In my view, if the Kansas appellate courts are ever going to straighten out what has become a multiple acts morass, it is vital to consider the holding of *Hill* and the Supreme Court's application of it carefully and in appropriate context.

In *Hill*, the State filed one count of rape among other charges arising out of a series of unwanted sexual advances made in multiple rooms of the victim's home over the course of a few minutes. The victim testified to the distinct order of each of two digital penetrations of her vagina and to her exact location in the home at the moment of each. The State did not elect which of the two it wished to rely upon to support a conviction on the rape count, and no multiple acts unanimity instruction was requested or given. See PIK Crim. 3d 68.09.

Prior to *Hill*, the Court of Appeals had developed two possible patterns of analysis for facts such as those in *Hill*. Under the first, a panel could have applied the strict elect-or-instruct rule and reversed the conviction because of structural error. See *Wellborn*, 27 Kan. App. 2d at 394; *State v. Barber*, 26 Kan. App. 2d 330, 331, 988 P.2d 250 (1999). Under the second, given the two acts' relationship to one another as parts of a single series of advances that took place over a few minutes in one home, a panel could have concluded that the acts were not truly "multiple" at all and found no error. See *State v. Hazley*, 28 Kan. App. 2d 664, 671, 19 P.3d 800 (2001) (simultaneous constructive possession of drugs in numerous rooms of defendant's house not multiple acts underlying drug possession charge); *State v. Staggs*, 27 Kan. App. 2d 865, 867-68, 9 P.3d 601, *rev. denied* 270 Kan. 903 (2000) (punch followed by kick in one continuous fight not multiple acts underlying battery charge).

Under *Hill*, we are now directed to first determine whether "there is a possibility of juror confusion from the record or if evidence showed *either* legally *or* factually separate incidents." (Emphasis added.) *Hill*, 271 Kan. at 939. On the surface, this part of *Hill*'s holding appears to equate the possibility of juror confusion with the disjunctive legal separability *or* factual separability. Under the surface, however, the Supreme Court actually requires more before it will accept that a jury could have become confused.

"Incidents are legally separate when the defendant presents different defenses to separate sets of facts or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents. Incidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by 'a fresh impulse.'" *Hill*, 271 Kan. 929, Syl ¶ 3.

In other words, *both a particular type* of legal separability *and a particular type* of factual separability are needed to demonstrate the possibility of jury confusion.

The Supreme Court's application of its new rule to the facts in *Hill* also compels us to refine our understanding of this first step in this way. The *Hill* victim's ability to identify the order and exact location of the two penetrations at issue unavoidably yielded at least

one type of *factual* separability. Furthermore, the Supreme Court candidly observed that each penetration could have supported a separate count of rape without being vulnerable to a multiplicity argument. This was at least one type of *legal* separability. *Cf. State v. Long*, 26 Kan. App. 2d 644, 645-47, 993 P.2d 1237 (1999), *rev. denied* 268 Kan. 852 (2000) (multiple charges for multiple penetrations during series of attacks in 2-hour period in one home not multiplicitous).

Yet the Supreme Court found no possibility of jury confusion because the defendant "did not present a separate defense or offer materially distinct evidence of impeachment regarding any particular act." *Hill*, 271 Kan at 940. Rather, the defendant turned the trial into an up-or-down credibility contest by his "general denial of participation in any wrongful conduct." 271 Kan. at 940. The jury was either going to believe the victim's story that the defendant committed all of the alleged illegal acts, thus giving him his unanimous verdict on each component act, or it was going to believe the defendant's story that he committed none of them. In the Supreme Court's language,

"[t]he evidence offered no possibility of jury disagreement regarding Hill's commission of either of these acts. By the jury's rejection of Hill's general denial, we can unequivocally say there was no rational basis by which the jury could have found that Hill committed one rape but did not commit the other." 271 Kan. at 940.

The Supreme Court's first step under *Hill* harkens back to the second possible analysis pattern in the earlier Court of Appeals cases noted above. The difference is in the result that follows from a finding of factual and legal *in*separability.

The Court of Appeals' analysis would have ended there, holding no truly multiple acts existed and thus neither a State election nor multiple acts unanimity instruction was required. This result would have been consistent with that in *Simms v. United States*, 634 A.2d 442, 445 (D.C. App. 1993) (robbery of van containing money and tools constitutes single unbroken chain of events), which originated the definitions of factual and legal separability relied upon in *Hill*. The *Simms* court, when it found no factual or legal separability, arrived at the conclusion there were no truly multiple acts and thus

no possibility of jury confusion, rather than the other way around. Once that conclusion was reached, no harmlessness inquiry was necessary.

Our Supreme Court, however, evidently still regards the dual absences of an election and instruction as error when there is no finding of jury confusion, because it requires the process to continue through *Hill*'s second harmlessness step. In the words it adopted from the Court of Appeals opinion in *Hill*: "When jury confusion is *not* shown under the first step, the second step is to determine if the error in failing to give a unanimity instruction was harmless beyond a reasonable doubt with respect to all acts." (Emphasis added.) 271 Kan. at 939. This is puzzling, because the first step has already ruled out the existence of jury confusion and the lack of unanimity it can breed. These were the evils the elect-or-instruct rule was designed to eradicate.

Within this analytical context, it is therefore little wonder that the Supreme Court proceeded to decide that whatever error occurred in *Hill* was harmless. Indeed, it is difficult to imagine how any failure to elect or instruct could ever be deemed harm*ful* once the result of *Hill*'s first step was a finding of no possibility of jury confusion.

It is also worth noting that *Hill* gave rise to several unanswered questions. If we are to engage in a harmlessness analysis when there is no finding of possible jury confusion, how, if at all, should the second step be altered when we find a possibility of such confusion? Structural error analysis is no longer available. Should harm*ful* error be presumed absent a contrary showing from the State? If the burden on appeal does not shift to the State, then is a situation where jury confusion has been demonstrated to be reviewed for harmlessness no different from one where no jury confusion has been found? If so, then what difference does the presence or absence of the possibility of jury confusion actually make? Does the first step have any validity? And finally, if the two steps ultimately make jury confusion irrelevant, then do we not lose sight of the reason we focused on this issue in the first place?

Where does all of this leave M.M. and the alleged multiple acts in this case? If the evidence in *Hill* left no room for jury confusion

and lack of unanimity, then the evidence here certainly left no such room. M.M. was simply incapable of testifying to specific characteristics of incidents of repeated abuse sufficient for the prosecution or jury to differentiate among them. As the majority opinion points out, the abuse had "result[ed] in an amalgamation of the crimes in the child's mind." *People v. Luna*, 204 Cal. App. 3d 726, 748, 250 Cal. Rptr. 878 (1988).

Other courts have labeled the vague testimony of such child victims who are repeatedly abused "generic" and have fashioned rules specifically designed to protect them and those they accuse. For example, in *R.L.G. Jr. v. State*, 712 So. 2d 348 (Ala. Crim. App. 1997), one of the many opinions from other jurisdictions cited by the Supreme Court in *Hill*, the court observed:

"The facts before us do not lend themselves to a straightforward application of the general law of election as it currently stands . . . : the evidence of the appellant's alleged abuse of [the victim] presents absolutely no 'distinct and separate transactions' upon which to apply the general law and require an election.'

"The term 'elect' implies a knowledge of facts which go to make up two or more offenses; . . . to hold [the prosecutor] to have elected to proceed for a certain offense, he must have learned enough to enable him to individualize the transaction, and then pursue his inquiry with a view of learning the details and particulars of the act or transaction thus individualized.' *Jackson v. State*, 95 Ala. 17, 18, 10 So. 657, 657 (Ala. 1892). The very nature of the evidence in this case . . . is dictated by the nature of the circumstances of the alleged abuse: abuse upon a young child by an abuser residing with the child, thus an abuser who could perpetuate the abuse so frequently and in so many locations that the young child loses any frame of reference in which to compartmentalize the abuse into 'distinct and separate transactions.' Such evidence of abuse has been termed 'generic evidence.' " *R.L.G. Jr.*, 712 So. 2d at 356.

The Alabama court held that, because the statutory scheme at issue did not allow for charging of a continuing offense covering child sexual abuse, a situation Kansas faces as well, see *Wellborn*, 27 Kan. App. 2d at 395, the strict elect-or-instruct rule must be modified:

" '[W]hen there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed

all the acts described by the victim.' " *R.L.G. Jr.*, 712 So. 2d at 361 (quoting *People v. Jones*, 51 Cal. 3d 294, 322, 270 Cal. Rptr. 611, 792 P.2d 643 [1990]).

In my view, the Alabama court's idea of a modified unanimity instruction for generic evidence child abuse cases has merit. Such a rule also could be applied in cases such as *Hill*, when the victim's testimony is more specific as to multiple acts but the defendant's general denial reduces the trial to a credibility contest. I believe jurors should be told that they may find the defendant guilty if they unanimously agree he or she committed *any one of the acts or all of the acts* described. Such an instruction strikes a sound balance between the defendant's and the victim's rights while respecting the current statutory scheme. If this rule were adopted, the absence of such an instruction would be regarded as error. Then, in keeping with the Supreme Court's unequivocal expression of disapproval for structural error analysis, a harmlessness analysis would follow. This pattern, to me, vastly improves upon the internally inconsistent *Hill* two-step analysis.

A strict elect-or-instruct rule is inappropriate for the truly generic evidence child abuse case. Some exception is necessary to ensure that perpetrators of the most egregious violations upon the most vulnerable of our children are punished. Given the absence of a continuing offense covering child sexual abuse in our criminal code and the inability of the youngest and most traumatized children to recite specifics of the circumstances surrounding the abuse they have suffered, the rule must be relaxed when credibility is the only genuine issue. It is simply impossible for the prosecutor to elect which among multiple indistinguishable acts he or she relies upon for conviction, and it is likewise impossible for jurors to select one from a string of undifferentiated incidents to arrive at a verdict. Rigid adherence to the elect-or-instruct rule would disable or derail prosecution altogether, removing from the reach of the law those whose depredations were so frequent or so long-term or so aimed at the inarticulate that generic testimony is all that can be marshalled against them.

I would also emphasize, however, that any case in which the defendant had ammunition beyond general attacks on the victim's

credibility, or general endorsements of his or her own, would still have to be subject to the elect-or-instruct rule. If alibi or identity was in issue, if the victim or other witnesses were able to put any more meat on the bones of the allegations that might be picked off by cross-examination about physical implausibility or other weaknesses, then that requirement would apply. If there was neither an election by the prosecution nor an instruction by the district court, only a convincing demonstration that the omissions were harmless should save a conviction from reversal.

Unless and until my view is adopted, however, I agree *Hill*'s first step leads inexorably to a finding of no possibility of jury confusion in this case, and, under its second step, any error in failing to elect or instruct was therefore harmless beyond a reasonable doubt as to all acts.