NOT DESIGNATED FOR PUBLICATION

No. 118,171

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSHUA MICHAEL WALKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Opinion filed November 2, 2018. Affirmed in part and dismissed in part.

*Michael Jilka*, of Nichols Jilka LLP, of Lawrence, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and MALONE, JJ.

PER CURIAM: Because his counsel improperly limited his prior direct appeal to sentencing issues, Joshua M. Walker, convicted of rape and aggravated criminal sodomy of his five-year-old daughter, raises three trial issues in this appeal. Walker claims prosecutorial error when the prosecutor misstated the law during closing arguments. He argues the trial court erred when it allowed the victim to testify via closed circuit television. Finally, he asserts that it was reversible error for the court to submit the question of his age to the jury instead of including that issue as an element of the crime. We find the claimed errors are not grounds for reversal and affirm his convictions.

1

Walker also tacks on an issue concerning the court's refusal to grant his sentence departure motion. Since this court has previously decided this issue against him in his first direct appeal, the "law of the case" doctrine requires us to dismiss that portion of his appeal.

*Walker forces his daughter to engage in sexual acts.*

Walker and his daughter, K.W., lived with Walker's stepmother Debra and his father from the time that K.W. was 11 months old until Walker met Lori. But often Walker moved K.W. back to his parents' house when he had a problem with Lori. Around August to October 2010, Debra noticed when Walker came to pick up K.W., K.W. would get upset and did not want to go with him. K.W. threw fits and screamed. She ran from Walker and hid. She "ran from the house screaming bloody murder." She broke out with acute eczema blisters and sores all over her body, which were brought on by stress. K.W. was in kindergarten at this time.

In November 2010, five-year-old K.W. disclosed to her stepmother, Lori, that Walker, "made her take medicine out of a spoon that was in his pants." K.W. reported that Walker placed her "in a couple of different positions, one laying on her back with her feet up by her head, and the other one with her on her knees" and that "he put his privates on her bottom and made her scream." She demonstrated the positions and said that "Daddy's spoon" was "yucky." They heard Walker's car pull up and K.W. stopped talking.

Lori confronted Walker and he "immediately started crying" and told Lori that he "didn't do it" and begged her to believe him. K.W. then walked into the room and asked why Walker was crying. Walker looked at her and said, "Daddy wouldn't hurt you. Daddy didn't do this." K.W. repeated, "Daddy didn't do this." K.W. then left the room. Lori followed and asked K.W. why she would say he did those things if he did not do

2

them. K.W. told Lori, "Mommy, I'm sorry, but he did do this." Lori did not report K.W.'s disclosure.

In June 2011, Debra observed that K.W. did not want to be alone with her father. One day that month, Lori saw K.W. kneeling on her bed facing her younger brother, T.W., who was standing. Then, K.W. reached up and pulled down T.W.'s shorts and his boxers, held his penis, and was "getting ready to put it in her mouth." Lori separated the children and asked K.W. why she would do that. In response, K.W. told her, "That's what Daddy makes me do." K.W. again told Lori that Walker placed her in the same positions she demonstrated previously, fed her "medicine from the spoon in his pants," and he "put [his pee pee] on her bottom and made her scream." K.W. also said that he told her not to bite the spoon. She said it happened on a day that she had misbehaved at school.

Lori told Debra about the accusations. Lori also told her father, who called the police. After speaking to Lori, Debra asked K.W. if anyone had touched her on her private parts. K.W. said "No." "Except for my daddy." K.W. said that Walker "had been giving her medicine from the spoon in his pants." She said that he had put it in her mouth and in her front. She pointed to her front and to her bottom. She said that it was painful, it made her cry, and the hair made her gag.

Debra and her husband told Walker that he had to leave their house and that K.W. would stay with them. K.W.'s behavior issues began to escalate after that. K.W. would not sleep at night, fearing that Walker would come back. K.W. said she never wanted to see Walker again.

On July 7, 2011, a social worker for SRS, Lindsay Bishop, interviewed K.W. using the "Finding Words" method. K.W. told her that Walker put his privates inside of her bottom, inside of her privates, and inside of her mouth. She said it happened at Lori's house. She said it "hurted." This occurred "every day when I was with my daddy." She

3

said she saw Walker's privates "ten times" and then said "six times." Her daddy's privates were long like an "elephant trunk." She said, "Every time he puts his privates in my mouth, I felt hair going in my mouth." She said he "was choking me with it."

On July 8, 2011, Sergeant Tom Willis interviewed Walker. Walker denied abusing K.W. But he believed that someone sexually abused her and then admitted that he possibly abused her "subconsciously."

*The Charges Come to Trial.*

The State charged Walker with rape and two counts of aggravated criminal sodomy. The State moved under K.S.A. 22-3434 for K.W. to testify outside the presence of Walker. Walker opposed the motion, but the court granted it.

When the case proceeded to a jury trial, Walker renewed his objection to K.W. testifying via closed-circuit television. The court overruled the objection. K.W. testified via closed-circuit television that Walker had placed the "privates that boys have" on her "privates" between her legs, her bottom, and her mouth. She testified that he touched his privates on her mouth one time.

Lori, Debra, and Bishop testified concerning K.W.'s disclosures of sexual abuse to them. A video of K.W.'s interview with Bishop was played for the jury.

Christine Juliano, a clinical psychotherapist, testified that K.W. told her that Walker touched her in her bottom with "his private" and he would "put his private in my mouth." He did those things "[a] lot of times." She said, "One time he touched me in the front with his private." She said it happened at Lori's house. She thought she was in kindergarten when he started touching her. Juliano also testified that K.W.'s grandparent's reported to her that K.W. had been "masturbating to the point of rubbing herself raw."

4

Officer Willis testified about his interview of Walker. A video of the interview was also played for the jury.

LeChelle Williams, a pediatric nurse practitioner at Children's Mercy, testified that she examined K.W. and found no physical signs of injury to K.W.'s vagina or anus. She explained that this is normal in cases of sexual contact. The tissue stretches, and it heals quickly and completely. It is rare to see physical signs of injury even when an adult penetrates a young child.

The defense called Dr. Mark DeRoo. Dr. DeRoo performed a physical on K.W. in January 2011 and found nothing unusual with regard to her genitals. The defense called an expert, Kathie Nichols, who testified the "Finding Words" protocol was suspect.

Walker testified. He denied sexually abusing his daughter. But he again admitted that it was possible he could have done it subconsciously or when he was not in his right mind.

The jury convicted Walker of rape and two counts of aggravated criminal sodomy. Walker filed a motion for a new trial alleging, among other things, that the court erred by granting the State's motion to take K.W.'s testimony outside of his presence. The court denied the motion. On July 27, 2012, Walker was sentenced to life in prison with no possibility of parole for 25 years.

*A Prior Appeal Resolves a Sentencing Issue.*

Walker's counsel filed a notice of appeal stating that Walker appealed from his "sentencing." In that appeal, Walker raised four trial errors and one sentencing issue. This court held that it did not have jurisdiction to consider the trial errors because Walker only gave notice to appeal his sentence. But the court did consider Walker's argument that the

district court abused its discretion by denying his downward departure motion. The panel found no abuse of discretion. See *State v. Walker*, 50 Kan. App. 2d 900, 334 P.3d 901 (2014).

Walker now contends the district court erred by denying his departure motion. But this issue was already decided against him in his original direct appeal. He was only precluded from raising trial errors in the previous appeal. The court considered Walker's sentencing argument, found no error, and affirmed his sentences. See 50 Kan. App. 2d at 905-06. The principle of "law of the case" precludes this court from reconsidering Walker's sentencing issue. See *State v. Collier*, 263 Kan. 629, Syl. ¶ 3, 952 P.2d 1326 (1998). *Collier* held that when a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions. This issue is dismissed.

*Walker Obtains Habeas Corpus Relief.*

Walker filed a K.S.A. 60-1507 motion alleging ineffective assistance of counsel. He alleged that his trial counsel was ineffective for, among other things, filing the limited notice of appeal. The district court agreed that Walker's trial attorney was ineffective by filing the limited notice of appeal and granted Walker the right to file a direct appeal out-of-time. The court denied Walker's ineffective assistance of counsel claims unrelated to the notice of appeal. The State did not appeal the district court's order granting Walker an out-of-time direct appeal.

Walker filed a notice of appeal in the K.S.A. 60-1507 proceeding, appealing his conviction, sentence, and all rulings made by the court. He raised four issues from the original direct appeal, and one issue of ineffective assistance of counsel he raised in the K.S.A. 60-1507 proceeding. Because Kansas law does not allow an accused to have a direct appeal and a K.S.A. 60-1507 motion pending at the same time, this court issued an

order for Walker to choose to proceed as a direct appeal or to proceed as an appeal of any adverse rulings in the K.S.A. 60-1507 proceeding. Walker elected to proceed as a direct appeal from his conviction. Therefore, Walker's final issue regarding ineffective assistance of counsel will not be considered by this court.

*We find no reversible error arising from the prosecutor's closing arguments.*

Even though Walker did not object to the prosecutorial comments he complains about, we will consider the issue because such a claim is reviewable on appeal even in the absence of a contemporaneous objection. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015).

A new framework for evaluating challenges based on the behavior of prosecutors has been established by our Supreme Court in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). In *Sherman*, the court replaced the term "prosecutorial misconduct" with the term "prosecutorial error." The court dispensed with the practice of factoring a prosecutor's ill will or gross misconduct into the prejudice analysis. The *Sherman* framework focuses on the defendant's right to receive a fair trial. *State v. Kahler*, 307 Kan. 374, 410 P.3d 105 (2018). We hold that *Sherman* applies here.

Here is the *Sherman* framework:

"In analyzing claims of prosecutorial error, appellate courts will employ a two-step process, first determining whether error occurred and, if it did, then determining whether prejudice resulted. 305 Kan. 88, Syl. ¶ 6. Under the first step, we will continue to analyze whether the prosecutor's statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' 305 Kan. 88, Syl. ¶ 7. At the second stage of the analysis, rather than step through the three *Tosh* factors, the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a

7

fair trial; if a due process violation occurs, prejudice will be assessed by applying the *Chapman* constitutional error standard. 305 Kan. 88, Syl. ¶ 8. Under that standard, '[p]rosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Kleypas*, 305 Kan. 224, 315-16, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

*Following the new framework, we examine the question of jury unanimity.*

Walker contends that the prosecutor misstated the law on jury unanimity and multiple acts. Misstating the law is not within the wide latitude given to prosecutors in closing arguments. A prosecutor crosses the line by misstating the law. *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). And a defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement. *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011).

"A jury unanimity issue arises where the jurors have heard evidence that the defendant committed multiple acts, any one of which could support a conviction on a single count in the charging document, because a jury must be unanimous as to the particular act that is the basis for a conviction." *State v. Moyer*, 306 Kan. 342, Syl. ¶ 6, 410 P.3d 71 (2017).

Walker cites the following statements by the prosecutor as misstatements of the law:

"What you all have to do is you have to say together we agree that the defendant put his penis in her vagina *at least one time*. We all agree together that it was at least one time during that time period. *You don't have to find a specific date*.

"And as to Count 2 on the oral sodomy, of course, she's been very clear that there was oral contact or oral penetration, so that is just charged as it is. And, again, you have

8

to find that *at least one time in that time period* that he placed his penis in her mouth. And you *all agree together that it happened on at least one occasion*.

. . . .

"You again, on the anal sodomy, have the same unanimity instruction, where we all agree together it happened at least once during that time frame. *Don't have to pick a date, just we all agree it happened at least once.*" (Emphasis added.)

Walker relies on *State v. Wells*, 296 Kan. 65, 290 P.3d 590 (2012). In *Wells*, the prosecutor charged the defendant with two counts of rape and two counts of sodomy occurring sometime between August 2006 and July 2007. The alleged crimes occurred on multiple occasions. The victim could not give specific dates. The district court gave a unanimity instruction. During closing arguments, the prosecutor told the jurors that they had to unanimously agree that a rape occurred "at least once" and then "at least a second time." Our Supreme Court found that the prosecutor's comments "misconstrued the meaning of the unanimity instruction because the statements conveyed to the jury that it could find Wells guilty of both rape counts without unanimously agreeing on the underlying act constituting each rape count." 296 Kan. at 79. The court found the prosecutor misstated the law. 296 Kan. at 79. But the error was harmless. 296 Kan. at 82.

Here, a fair reading of *Wells* leads us to conclude that the prosecutor erred. The question then becomes whether that error is harmless beyond a reasonable doubt. Caselaw indicates it is.

The cases where courts have failed to instruct on unanimity are helpful on this point. In *State v. Voyles*, 284 Kan. 239, 240, 244, 160 P.3d 794 (2007), there was testimony that potentially 20 different acts or offenses were committed, but the defendant was charged with eight counts for conduct involving two girls—four counts of aggravated indecent solicitation of a child and four counts of aggravated criminal sodomy. The State failed to elect which of the several acts it relied on to constitute each count, and the court failed to give a unanimity instruction. The evidence showed a

9

number of factually separate incidents at different locations apparently on different days. There was no unified defense. The court found a real possibility that the jury would have reached a different verdict if a unanimity instruction had been given. The court distinguished the case from one involving "generic evidence," i.e. multiple indistinguishable acts of sexual abuse of young children. 284 Kan. at 255.

In contrast, in *State v. Arculeo*, 29 Kan. App. 2d 962, 975-76, 36 P.3d 305 (2001), this court found the failure to give a unanimity instruction harmless error when multiple acts of sexual abuse over a long period of time were described. The victim's description of the abuse

> "offered no distinguishing characteristics identifying any separate and distinct incidents
> of abuse. Rather the abuse 'result[ed] in an amalgamation of the crimes in the child's
> mind'; thus, 'the child's testimony [was] reduced to a general, and customarily
> abbreviated, recitation of what happened on a continuing basis.' [Citation omitted.]" 29
> Kan. App. 2d at 974.

The sole issue was credibility. The child gave specific evidence of the sexual acts so that the jury could conclude that it came from personal experience. The defendant was charged with only one count of aggravated criminal sodomy and one count of aggravated indecent liberties with a child. The evidence was such that there was no possibility of jury disagreement regarding the defendant's commission of any of the acts. 29 Kan. App. 2d at 975; see *State v. Johnson*, No. 107,524, 2013 WL 2321167, at *2-4 (Kan. App. 2013) (unpublished opinion).

Here, the State charged one act of rape, one act of oral sodomy, and one act of anal sodomy. The timeframe the jurors were given on each count was between August 1, 2010 and May 31, 2011. K.W. could distinguish that there were three sex acts performed (rape, oral sodomy, anal sodomy), but she could not factually distinguish separate incidents within each category. She said that the abuse happened at Lori's house while Lori was at

10

work. She made references to being in kindergarten when the abuse happened. There was some inconsistency regarding how many times each sex act occurred. She told Bishop the acts occurred "every day when I was with my daddy." She said she saw Walker's privates "ten times" and then said "six times." She told Juliano that he touched her on her bottom with his private and put it in her mouth "[a] lot of times." She said "one time" he touched her in the front with his private. She testified that he touched his privates on her mouth one time.

K.W. gave specific information that could have only come from personal experience, so the jurors could reasonably conclude that she was forced to endure all three sex acts. But, unlike in *Voyles*, there was no reasonable possibility that some jurors found a particular act of rape occurred on a particular day, while other jurors found a different rape on a different day. This case is like *Arculeo*. The abuse resulted in an amalgamation of the crimes in K.W.'s mind. There simply was not the kind of evidence in the record to distinguish between separate incidents of rape, or to distinguish between separate incidents of oral sodomy. The defense was a complete denial. The issue was K.W.'s credibility.

The prosecution's case was strong. K.W. gave details that a five-year-old child could not know and could not learn from walking in on her parents having sex or viewing pornography—the hair in her mouth, that he told her not to bite the "spoon," that it felt like he was choking her, and that it "hurt." Also, during the timeframe when the crimes occurred, her behavior changed. She did not want to go with her father when he came to pick her up and she ran away from him screaming. K.W. consistently and exclusively identified her father. When asked by Bishop whether anyone else had touched her privates, she was clear: "Not Uncle John, not Uncle Mike and not papaw [her grandfather] but only my dad." And Walker admitted it was "possible" he committed these crimes "subconsciously."

Additionally, the court did give a unanimity instruction. On each count, the court instructed the jury that the State claimed distinct multiple acts, each of which could separately constitute the crime, and the jury must unanimously agree on the same underlying act. And defense counsel told the jurors that they must unanimously find "what act, on what day."

We hold that the State has shown beyond a reasonable doubt that the prosecutor's comments did not affect the outcome of the trial in light of the entire record. There is no reasonable possibility that the error contributed to the verdict.

*Next, we examine the prosecutor's comments.*

Walker contends the prosecutor improperly bolstered K.W.'s credibility by stating: "But when you take all this evidence together, you will see that this evidence has proven beyond a reasonable doubt *that [K.W.] can be believed in what she is saying and what she has been saying to people.*" (Emphasis added.)

It is well settled that it is improper for a prosecutor to attempt to bolster the credibility of a State witness. *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 (2005). Prosecutors may not offer their personal opinions on the credibility of witnesses. *State v. Pabst*, 268 Kan. 501, 506-07, 996 P.2d 321 (2000). The reason is that expressions of personal opinion by a prosecutor are a form of unsworn and unchecked testimony. *State v. Hall*, 292 Kan. 841, 852, 257 P.3d 272 (2011). The jury must be left to draw the ultimate conclusion on witness credibility. *State v. Hart*, 297 Kan. 494, 505-06, 301 P.3d 1279 (2013).

Prosecutors, however, have wide latitude to tell the jury what to look for to assess witness credibility and to ask the jury to draw reasonable inferences from the evidence. *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011); *State v. McReynolds*, 288

12

Kan. 318, 325, 202 P.3d 658 (2009). The prosecutor's comments must be viewed in context, not in isolation. *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010).

A helpful case is found in *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003), where the court held that the prosecutor's statement "the evidence has shown that [S.K.F.] *should be believed* by you and that you should return verdict on all of those counts" did not constitute vouching for S.K.F.'s credibility. (Emphasis added.) The prosecutor merely made a reasonable inference based on the evidence. 275 Kan. at 122.

Later then, in *State v. Williams*, 299 Kan. 911, 329 P.3d 400 (2014), the prosecutor told the jurors to evaluate the credibility of the witnesses. The prosecutor pointed out specific evidence that boosted the credibility of the victim—the consistency of the victim's statements and the evidence that corroborated the victim's version of events. Then the prosecutor asked, "Doesn't that make her . . . credible?" In context, the court found the statement not outside the wide latitude afforded prosecutors in discussing evidence. 299 Kan. at 937.

With the guidance of those cases, we see that the prosecutor's comments did not bolster her credibility. The prosecutor's comment here was in the context of responding to the defense's assertion that there was no corroboration of K.W.'s testimony. Defense counsel stated, "No corroborating evidence whatsoever. So it literally comes down to little [K.W.'s] statements." In response, the prosecutor cited the following as corroboration: K.W.'s attempts to avoid her father by hiding and crying when he came to pick her up; the consistency in her statements; K.W.'s behavior—rage, tantrums, anxiety, masturbation, PTSD; her knowledge of sexual acts that a five-year-old should not know; her attempt to perform a sexual act with her brother; and Walker's own statement that it was possible he abused her. Right after listing all of the corroboratory evidence, then the prosecutor made the statement Walker complains about. The prosecutor also told the

13

jurors that they were going to have to determine whether K.W.'s statements were credible.

The prosecutor did not give her personal opinion of K.W.'s credibility. Rather, the prosecutor directed the jury to the corroboratory evidence. In context, the prosecutor's comment was not outside of the wide latitude afforded to prosecutors.

*We find no burden shifting here.*

Walker contends that the prosecutor improperly shifted the burden of proof on Walker by stating: "Other corroboration? Knowledge of sexual acts that a five-year-old is not going to know. *We still haven't heard where those would come from. One place and one place only, from the defendant doing these things to her*." (Emphasis added.)  This was part of the same discussion as the prior issue.

Without a doubt, it is improper for the prosecutor to attempt to shift the burden of proof to the defendant. *State v. Wilson*, 295 Kan. 605, 623-24, 289 P.3d 1082 (2012). But prosecutors have "considerable latitude" to comment on the weakness of the defense. *Williams*, 299 Kan. at 939. In *Wilson*, the prosecutor commented that the defendant could not provide an innocent reason why his DNA was found at the murder scene. The court found the prosecutor was not shifting the burden of proof, but rather pointing out where the defendant's version of events logically broke down. And, importantly, the prosecutor told the jury to give whatever weight and credit it could to the defendant's testimony. 295 Kan. at 625.

Here, the prosecutor was not shifting the burden of proof, but rather answering Walker's argument that there was no corroboration for K.W.'s claims and pointing out where Walker's defense broke down. The prosecutor also told the jurors that it was their

14

job to determine whether K.W.'s statements were credible. The prosecutor's statement was within the wide latitude afforded prosecutors.

*We find no error in how the victim's testimony was presented.*

Walker contends that the district court erred by granting the State's motion to allow K.W. to testify via closed-circuit television. He contends that his right to confront his accuser under the Sixth Amendment to the United States Constitution was violated. We disagree.

K.W. testified in the judge's chambers next to the courtroom. Her testimony was live-streamed in the courtroom. The attorneys and K.W. were in chambers. Walker, the judge, and the jury were in the courtroom. Walker was permitted to stop the questioning so that he could confer with his attorney. Walker's attorney thoroughly cross-examined K.W.

Kansas law permits a trial court to order a child-victim who is under the age of 13 to testify in a room other than the courtroom by closed-circuit television. K.S.A. 22-3434(a)(1). "The state must establish by clear and convincing evidence that to require the child who is the alleged victim to testify in open court will so traumatize the child as to prevent the child from reasonably communicating to the jury or render the child unavailable to testify." The court must make an individualized finding as such. K.S.A. 22-3434(b).

An important ruling on this point is found in *State v. Boyd*, 281 Kan. 70, 127 P.3d 998 (2006). The Supreme Court explained how the statute is to be implemented:

> "A defendant is not denied the constitutional right to confrontation where a child-victim witness testifies via closed-circuit television pursuant to K.S.A. 22-3434, provided

15

the trial court (1) hears evidence and determines use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) finds that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) finds that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, *i.e.,* more than mere nervousness or excitement or some reluctance to testify." 281 Kan. 70, Syl. ¶ 8.

The court heard evidence in support of the motion from K.W.'s therapist and her grandmother. Juliano testified that K.W. had ADHD, PTSD, and adjustment disorder with anxiety. When Juliano first saw K.W., she was having temper tantrums, rages, yelling, screaming, and would not accept "no." But her behavior improved. Her rages and tantrums decreased dramatically. That changed after Juliano discussed with K.W. the prospect of K.W. testifying in court in front of her father. K.W. said that she would be scared to testify in front of her father; but that she would do it. After this conversation, though, K.W.'s behavior became more rageful. She became sad and withdrawn. She became inconsolable—yelling and screaming. She picked at her skin until it bled, indicating anxiety. Juliano testified that it was her opinion K.W. should not testify in front of her father. Juliana believed K.W.'s anxiety would increase immensely and she would withdraw within herself. Juliano was concerned that K.W. would refuse to speak at all if she saw her father. When Walker challenged K.W. about her initial accusation saying he did not do it, he slammed a lot of doors, got very angry, and made K.W. scared.

Walker's stepmother, Debra Walker, testified that when K.W. was living with her in the summer of 2010 and Walker came to pick her up, she would cry and scream and not want to leave with him. She developed acute eczema from stress and was constantly picking scabs on her body. After Walker was gone, she was scared of going to sleep at night, afraid that Walker would come back and take her. K.W. saw a picture of her father and said, "I don't want to see him." She wanted to cut up the picture. She started acting out and got very angry—throwing, kicking, fighting, slamming doors, and screaming.

16

Debra then brought her to see Juliano. After that, K.W.'s outbursts decreased over time. She started excelling in school. Her eczema cleared up. Then Debra and Juliano talked with K.W. about testifying in court. The outbursts and eczema came back and she stopped focusing at school. Debra believed that K.W. would shut down or become upset if she had to testify in front of Walker. Debra testified that K.W. does not like to hurt people and if Walker showed any emotion, K.W. would not talk. Debra cited her previous encounter with Walker over the allegation.

The trial court made all of the required findings. It ruled that the State presented clear and convincing testimony that K.W. testifying outside the presence of her father was necessary to protect her welfare. The court cited K.W.'s statement that she was scared of her father. The court cited her physical acting out and temper tantrums. The court found K.W. would suffer "major" emotional distress and "great" trauma testifying in front of her father, and that it was more than just nervousness or reluctance to testify. The court found that the emotional distress was not incidental to the stress caused to anyone by testifying. The court noted her PTSD and other diagnoses. The court noted that her age was important. The court cited her earlier encounter with her father over the accusation. The court found there was a strong possibility that K.W. would completely shut down and not give testimony at all.

The trial court's findings here are supported by substantial competent evidence. The court followed the correct statutory procedure. We see no error here; Walker's right to confront his accuser was not violated.

*The special jury question was harmless error.*

Walker contends the district court committed reversible error by submitting his age as a special jury question rather than as an element of the crimes. He acknowledges that he did not raise this issue below. Interestingly, the State did ask for Walker's age to

17

be added as an element to each count. But the court stated that it did not think age was an element; the court said that it should be on the verdict form instead.

Because Walker did not object to the instructions, this court's review is for clear error. No party may assign as error the giving or failure to give an instruction unless the party objects before the jury retires to consider its verdict unless the instruction or the failure to give an instruction is clearly erroneous. K.S.A. 2017 Supp. 22-3414(3); *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). To establish clear error, the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

It is undisputed that:

"Where the defendant's age is an essential element of an off-grid crime . . . the trial court errs when it submits . . . the defendant's age to the jury in a special question on the verdict form rather than including the element in the jury instruction that enumerates the elements of the crime." *State v. Brown*, 298 Kan. 1040, Syl. ¶ 1, 318 P.3d 1005 (2014).

The parties agree the court erred. The State charged Walker with the off-grid forms of rape and aggravated criminal sodomy, for which an essential element was that Walker was 18 years or older. See *Brown*, 298 Kan. at 1045. In *Brown*, the defendant's age at the time of the offense is an element of the crime if the State seeks to convict the defendant of the more serious, off-grid level of the offense. The court here did not instruct the jury that Walker's age was an element of the crimes. But on the verdict form for each count, the court submitted a special question asking the jurors whether they "unanimously find beyond a reasonable doubt that the defendant was 18 years old or older at the time the offense was committed?" The jury answered yes on each form.

But the error was harmless.

18

"Where a jury answers a special question finding that the defendant was age 18 or older when committing the charged crime, and the evidence is sufficient to support that finding, the trial court's failure to include the defendant's age in the jury instruction on the elements of the crime is harmless error." *Brown*, 298 Kan. 1040, Syl. ¶ 2.

Here, Lori testified that Walker's date of birth was December 4, 1984. Walker testified he was 27 years old at the time of trial. The crimes allegedly occurred between August 2010 and May 2011. Defense counsel acknowledged that Walker's age was not in dispute. On the verdict form, the jurors were asked whether they unanimously found *beyond a reasonable doubt* that Walker was 18 when the offenses were committed. They answered yes. The jury would not have reached a different verdict had the instruction error not occurred.

Walker's convictions are affirmed. His departure motion issue is dismissed.